# EXHIBIT 3

STATE OF NORTH CAROLINA          IN THE GENERAL COURT OF JUSTICE
                                        SUPERIOR COURT DIVISION

COUNTY OF WAKE                      Case No.  20 CVS _____

FILED
2020 OCT 27  PM 3:43
WAKE

| | |
|---|---|
| MARCUS HALL and wife,<br>ALISA HALL,<br><br>        Plaintiffs,<br><br>v.<br><br>ALLURE HOMES, LLC; CHRISTOPHER PAUL<br>BAGGETT; CAROLINA COMFORT AIR, INC.;<br>and NEWCOMB AND COMPANY,<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**COMPLAINT**
**(Jury Trial Demanded)**

NOW COME plaintiffs Marcus Hall and wife, Alisa Hall ("Plaintiffs"), through undersigned counsel, and complain of defendants Allure Homes, LLC, Christopher Paul Baggett, Carolina Comfort Air, Inc., and Newcomb and Company ("Defendants"), as follows:

## INTRODUCTION

1.     This action arises from the defective construction of a home for the Hall family, which construction caused mold contamination throughout the home resulting from the operation of the HVAC systems.  The Hall home was constructed by Allure Homes, LLC ("Allure").  Allure owner Christopher Paul Baggett directly supervised construction of the Hall home.  The HVAC systems were designed and installed by Allure sub-contractor Carolina Comfort Air, Inc. ("CCA"). Newcomb and Company ("Newcomb") thereafter purported to perform bi-annual maintenance on the HVAC systems but failed to detect and/or report the presence of mold in the HVAC systems to Plaintiffs.

The periodic circulation of toxic mold spores throughout the Hall home each time the HVAC systems operated caused permanent and severe neurological damage and physical suffering to Plaintiff Alisa Hall.  (The effect of ongoing mold exposure on the three minor Hall children remains to be determined.  They are not plaintiffs in this lawsuit.)  Neither the presence

1

of mold growth in the HVAC systems nor mold as the cause of Plaintiff Alisa Hall's symptoms was identified until October 2018 despite inspections by Newcomb and dozens of medical consultations by Alisa Hall with numerous physicians. However, testing eventually revealed the presence of mold mycotoxins in Alisa's system and elevated levels of mold spores in the air circulating in the home.

Substantial effort was then expended to identify the source of the mold contamination, which was discovered to be in the HVAC systems. The Hall home required extensive, costly repairs to correct the deficiencies, remedy the damage and render the home fit to occupy. During approximately twenty months of assessment and remediation, Plaintiffs and their children were displaced from the Hall home. Plaintiffs file this action to recover the cost of analysis, system replacement, remediation and replacement of personal property, alternate living expenses, past and future medical expenses for Plaintiff Alisa Hall, and damages for physical pain and mental suffering for Plaintiff Alisa Hall.

## PARTIES

2.    Plaintiffs Marcus Hall, and wife, Alisa Hall ("Plaintiffs" or the "Halls") are the owners of a home at 4913 Yadkin Drive, Raleigh, North Carolina in Wake County.

3.    Defendant Allure Homes, LLC ("Allure") is a limited liability company organized and existing under the laws of the State of North Carolina with its offices and principal place of business located in Wake County, North Carolina.

4.    At all relevant times herein, Allure was a licensed residential general contractor pursuant to the licensing laws of North Carolina and acted as the general contractor for the construction of the Hall home.

5.    Allure holds itself out to the general public as a general contractor which constructs fine custom homes.

6.    Defendant Christopher Paul Baggett ("Mr. Baggett") is a resident of Wake County, North Carolina. At all relevant times herein, Mr. Baggett was the sole member (owner) of Allure

2

and was the qualifier for the general contracting license of Allure issued by the North Carolina Licensing Board for General Contractors.  Allure thus built the Hall home under the direction of Mr. Baggett.

7.     Defendant Carolina Comfort Air, Inc. ("CCA") is a corporation organized and existing under the laws of the State of North Carolina with its offices and principal place of business located in Johnston County, North Carolina.  At all relevant times herein, CCA provided services and materials related to the heating ventilation and air conditioning ("HVAC") systems designed and installed at the Hall home.

8.     CCA at all relevant times was licensed by and provided HVAC services on the Hall home through various employees licensed by the North Carolina State Board of Examiners of Plumbing, Heating and Fire Sprinkler Contractors.

9.     Defendant Newcomb and Company ("Newcomb") is a corporation organized and existing under the laws of the State of North Carolina with its offices and principal place of business located in Wake County, North Carolina.

10.    At all relevant times herein, Newcomb provided inspection and maintenance related to the HVAC systems installed at the Hall home.  Newcomb was licensed by and employed various individuals licensed by the North Carolina Board of Examiners of Plumbing, Heating and Fire Sprinkler Contractors in providing these services.

**JURISDICTION AND VENUE**

11.    This Court has jurisdiction over the subject matter and over the parties pursuant to N.C. Gen. Stat. §§ 1-75.4, 7A-240, and 7A-243.

12.    Venue is proper in this Court pursuant to N.C. Gen. Stat. §§ 1-79 and 1-82.

**FACTUAL ALLEGATIONS**

13.    In 2014, Allure entered into a contract with the Halls to provide general contracting services with respect to the construction of the Hall home.  The Offer to Purchase and Plan

3

Specifications are attached hereto as **Exhibits A and B** (the "Contract") and are incorporated by reference herein.

14.     Pursuant to the Contract, Allure undertook the construction of the home for the Halls (the "Hall Home") over approximately the next ten months.

15.     As a subcontractor of Allure, Defendant CCA provided materials and services related to the design and installation of the HVAC systems in the Hall Home.

16.     Construction of the Hall Home was completed in April 2015.     Immediately thereafter, Plaintiffs took possession of the property.

17.     Within two to three months thereafter, Plaintiff Alisa Hall began to experience problematic symptoms, including fatigue, insomnia, hair loss, numbness and tingling in her extremities, and weight gain.

18.     Over the next three years, Plaintiff Alisa Hall's symptoms worsened and began to include cognitive dysfunction and memory loss.  Despite dozens of medical consultations, no medical provider offered a definitive diagnosis nor provided substantial lasting relief from the symptoms.

19.     From 2016 through 2018, employees of Defendant Newcomb purportedly performed bi-annual inspection, maintenance, and repair services on the HVAC systems in the Hall Home.

20.     On October 3, 2018, the primary care provider for Plaintiff Alisa Hall ordered a screening for Ochratoxin A.  Ochratoxin A is a mycotoxin produced by several different fungi including Aspergillus and Penicillium molds.  These molds are commonly found growing on moist indoor surfaces.

21.     On October 8, 2018, Plaintiff Marcus Hall used a self-administered mold testing kit to collect air samples from each of the three levels of the Hall Home.  The home-testing report for each floor of the Hall Home came back as either "elevated" or "severe" for mold spores in the conditioned air of the Hall Home.

4

22. On October 11, 2018, Plaintiff Alisa Hall received the results of her Ochratoxin A screening. The common range of positive results for Ochratoxin A in urine are 1.2 – 5 ng/g of creatine. Results for Plaintiff Alisa Hall were 6.43 ng/g of creatine.

23. Plaintiff Alisa Hall was later diagnosed with Environmentally Acquired Illness due to suspected mold exposure.

24. On October 28, 2018, upon the advice of Mrs. Hall's physician, Plaintiffs and their three minor children moved out of the Hall Home and into the home of Plaintiff Marcus Hall's parents.

25. In December, 2018, Plaintiff Marcus Hall and Plaintiffs' three minor children all tested positive for Ochratoxin A at levels well above the common range for positive results. (The minor children are not plaintiffs to this lawsuit, as the effect of mold exposure on the minor children continues to be evaluated).

26. The Halls then engaged mechanical engineer Frank Tyndall ("Mr. Tyndall") and environmental engineer Robert Herrick ("Mr. Herrick") to determine the source and cause of the high levels of mold spores and mold growth present in the Hall Home.

27. In early 2019, Mr. Tyndall and Mr. Herrick determined that mold was growing in the HVAC systems due to design flaws in the HVAC systems serving the Hall Home.

28. On April 12, 2019, Plaintiffs by and through undersigned counsel notified Allure and Mr. Baggett of the problems identified by Mr. Tyndall and Mr. Herrick. On April 24, 2019, Plaintiffs by and through undersigned counsel notified CCA of the problems identified by Mr. Tyndall and Mr. Herrick. On April 26, 2019, Plaintiffs by and through undersigned counsel notified Newcomb of the problems identified by Mr. Tyndall and Mr. Herrick. All defendants were provided an opportunity to inspect the Hall Home, including the HVAC systems, prior to remediation.

29. From May, 2019, through June, 2020, Mr. Tyndall and Mr. Herrick oversaw remediation of the Hall Home. The efforts at remediation are documented in a timeline attached hereto as **Exhibit C** and incorporated herein by reference.

30.     On or about July 1, 2020, Plaintiffs were informed by Mr. Herrick that the Hall Home was clear of mold and the Plaintiffs and their three minor children moved back into the Hall Home, after approximately two months of residing with relatives and eighteen months of a townhome rental.

31.     On or about July 12, 2020, testing by Mr. Herrick confirmed that mold levels in the Hall Home were at minimal levels and the home was safe to occupy.

32.     On August 19, 2020, Plaintiffs by and through undersigned counsel notified counsel for defendants Allure, CCA, and Newcomb of the claims against each party as well as provided an itemized compilation of damages, both personal and real property and personal injury, incurred by Plaintiffs.  The August 19, 2020 letter from counsel is attached hereto as **Exhibit D** and incorporated herein by reference.

33.     As a result of her symptoms, Plaintiff Alisa Hall since 2015 has experienced over seventy-five visits with medical providers with specialties including neurology, rheumatology, cardiology, endocrinology, emergency medicine and functional medicine.

34.     Plaintiff Alisa Hall continues to suffer from the physical and neurological effects of prolonged mold exposure that she experienced as a result of residing in the Hall Home.

35.     At all relevant times herein, Defendant Allure held itself out as possessing expertise in the field of the construction of fine custom residential homes and that the Hall Home would be designed and built in accordance with all applicable regulations, standards, and codes and in a good and workmanlike manner.

36.     Defendant Allure knew that Plaintiffs would and did rely upon its expertise to see that the Hall Home was designed and built in a good and workmanlike manner and in conformance with the Contract and with all applicable regulations, standards and codes.

37.     Defendant CCA designed and installed the HVAC systems in the Hall Home. Defendant CCA held itself out as possessing expertise in the field of design and installation of HVAC systems.  CCA knew that Plaintiffs would rely and did rely  upon its expertise to see that

6

the HVAC systems in the Hall Home would be designed and constructed in a good and workmanlike manner and in accordance with the Contract and with all applicable regulations, standards, and codes.

38.     During the construction of the Hall Home by Allure, including the active participation of Mr. Baggett, the HVAC systems designed and installed by Defendant CCA in the Hall Home, were defective and promoted mold grown.

39.     That mold growth was not reported by Newcomb to Plaintiffs.

40.     Defendant Newcomb held itself out as possessing expertise in the field of inspection, maintenance and repair of HVAC systems. Defendant Newcomb knew that Plaintiffs would rely and did rely upon its expertise to see that the HVAC systems in the Hall Home would be inspected, maintained, and repaired if necessary, in accordance with all applicable standards for inspection and maintenance of residential HVAC systems and that any problems, including the presence of mold, would be reported to Plaintiffs.

41.     As a result of Allure's, Mr. Baggett's, and CCA's failures to properly design and construct the Hall Home and provide suitable HVAC systems, Plaintiffs have incurred significant damages, including:

<blockquote>

a.     Costs reasonably necessary to determine the source and cause of the mold problems;

b.     Costs reasonably necessary to fully and properly remediate mold problems in the Hall Home;

c.     Costs associated with storage, remediation, and replacement of personal property;

d.     Costs associated with securing and renting alternate accommodations during the necessary remediation;

e.     Fees expended and the cost of testing to ascertain the nature and extent of the deficiencies and to determine when the Hall Home was safe for habitation;

f.     Paid medical expenses for Plaintiffs Marcus and Alisa Hall;

g.     Future medical expenses for Plaintiff Alisa Hall;

</blockquote>

7

h.    Physical pain and mental suffering for Plaintiff Alisa Hall; and

i.    Such other damages as may be shown at the trial of this matter.

42.    As a result of Defendant Newcomb's failure to properly inspect the HVAC systems and/or to disclose to Plaintiffs the presence of mold growth within the HVAC systems and/or to properly repair the HVAC systems, Plaintiffs' awareness of the existence of mold was delayed, increasing the severity of the mold and the cost of remediation and delaying the diagnosis and proper treatment of Alisa Hall's physical injuries.  Plaintiffs thus suffered significant damages, which could have otherwise been mitigated, reduced, or eliminated, including:

a.    Costs reasonably necessary to fully and properly remediate the Hall Home;

b.    Costs associated with storage, remediation, and replacement of personal property;

c.    Costs associated with securing or renting alternate accommodations during the necessary remediation;

d.    Fees expended and cost of testing to ascertain the nature and extent of the deficiencies;

e.    Paid medical expenses for Plaintiffs Marcus and Alisa Hall;

f.    Future medical expenses for Plaintiff Alisa Hall;

g.    Physical pain and mental suffering for Plaintiff Alisa Hall; and

h.    Such other damages as may be shown at the trial of this matter.

**FIRST CLAIM FOR RELIEF**
**(Breach of Contract – Allure)**

43.    The allegations of the preceding paragraphs are repeated here and incorporated by reference.

44.    At all relevant times herein, the Contract was valid and enforceable between Allure and Plaintiffs.

45.    The Contract, among other things, required Allure to design and construct the Hall Home in a good and workmanlike manner, without defects, and in conformity with all applicable regulations, standards and codes in conformity with the terms of the Contract.

8

46.     However, as alleged herein, the Hall Home was defectively designed and/or constructed and did not comply with the Contract.

47.     Plaintiffs did not become aware of the defective design and/or construction until October 2018, when Plaintiff Alisa Hall's mycotoxin results indicated high levels of mold exposure and testing of the conditioned air circulating in the Hall Home revealed elevated levels of mold spores.

48.     Allure's breaches caused Plaintiffs' damages by way of analysis, replacement and remediation of the defective construction, and personal injury damages, as alleged herein and as may be shown at trial.

49.     As a direct and proximate result of Allure's breach of contract, Plaintiffs have incurred damages in an amount in excess of twenty-five thousand dollars ($25,000) plus costs and expenses as allowed by law, including those damages alleged with more particularity above.

### SECOND CLAIM FOR RELIEF
**(Breach of Implied Warranties -- Allure)**

50.     The allegations of the preceding paragraphs are repeated here and incorporated by reference.

51.     Allure as general contractor is deemed to have given to Plaintiff an implied warranty of habitability that the Hall Home would be designed and constructed in a good and workmanlike manner, in accordance with industry standards and all applicable regulations, standards and codes, including but not limited to the North Carolina Mechanical Code, resulting in a suitable and safe home for habitation, and free from dangerous defects.

52.     However, as alleged herein, the Hall Home was designed and/or defectively constructed. As a result, the Hall Home was rendered uninhabitable due to mold contamination.

53.     If Allure had exercised reasonable care, it would have designed and constructed the Hall Home in accordance with the Contract and with all applicable regulations, standards, and codes, including but not limited to, the North Carolina Mechanical Code.

9

54. However, Allure did not comply with the Contract, did not exercise reasonable care, and failed to perform its work in a good, workmanlike manner and failed to discover and/or disclose latent defects in the design and/or construction of the Hall Home.

55. In addition, Allure knew or should have known that the Hall Home was not designed and/or constructed in accordance with the applicable regulations, standards, and codes, thus resulting in the defects and damages alleged herein.

56. Allure's failures constitute a breach of its warranties as alleged herein. The defects in the design and/or construction were latent and could not have been reasonably discovered by Plaintiffs.

57. As a result of Allure's breach of implied warranties as alleged herein, Plaintiffs have incurred damages in an amount in excess of twenty-five thousand dollars ($25,000) plus costs and expenses as allowed by law, including those damages alleged with more particularity above. All such damages were reasonably foreseeable.

### THIRD CLAIM FOR RELIEF
**(Negligence -- Allure)**
**(In the Alternative)**

58. The allegations of the preceding paragraphs are repeated here and incorporated by reference.

59. Allure had a duty to exercise reasonable care in the design and construction of the Hall Home and to design and construct the Hall Home in a good and workmanlike manner and in accordance with all applicable regulations, standards and codes.

60. A violation of the North Carolina Mechanical Code constitutes negligence *per se*.

61. If Allure had exercised reasonable care, it would have ensured that the Hall Home was designed and constructed in a good and workmanlike manner and in accordance with all applicable regulations, standards, and codes, including but not limited to, the North Carolina Mechanical Code §§ 501.3 and 505.2.

10

62.     However, Allure did not exercise reasonable care and failed to perform their work in a good and workmanlike manner and failed to discover latent defects in the design and/or construction of the Hall Home.

63.     In addition, Allure knew or should have known that the Hall Home was not designed and/or constructed in accordance with the applicable regulations, standards, and codes, thus resulting in defects and damages alleged herein.

64.     Allure's failures constitute a breach of its duties alleged herein. The defects in the design and/or construction were latent and could not have been reasonably discovered by Plaintiffs.

65.     Allure's negligence as alleged herein caused injury to the personal property of Plaintiffs, beyond that which was the subject of the contract, and also caused personal injury to Plaintiffs.

66.     As a direct and proximate result of Allure's negligence/negligence *per se*, Plaintiffs have incurred damages in an amount in excess of twenty-five thousand dollars ($25,000.00) plus costs and expenses as allowed by law, including those damages alleged with more particularity above. All such damages were reasonably foreseeable.

### FOURTH CLAIM FOR RELIEF
**(Negligence – Christopher Paul Baggett)**

67.     The allegations of the preceding paragraphs are repeated here and incorporated by reference.

68.     Upon information and belief, Mr. Baggett was the qualifier for Allure with the North Carolina Licensing Board for General Contractors. His licensure by the North Carolina Licensing Board for General Contractors permitted Allure to hold itself out to the public and to perform services as a general contractor.

69.     At all relevant times, Mr. Baggett personally and actively supervised the day-to-day construction of the Hall Home.

11

70.     Mr. Baggett owed the Plaintiffs a duty of reasonable care in the design and construction of the Hall Home.

71.     Mr. Baggett breached that duty when he failed to properly supervise the design and/or construction of the Hall Home.

72.     Mr. Baggett's specific acts of negligence include, but are not limited to, the following:

  a.    Mr. Baggett failed to supervise, inspect, and direct construction competently to ensure that it was performed in accordance with the proper design and construction provisions of applicable regulations, standards, and codes and in a good and workmanlike manner;

  b.    Mr. Baggett failed to supervise CCA to determine whether it balanced the HVAC systems in the Hall Home and did so properly;

  c.    Mr. Baggett failed to ensure that the HVAC systems were in compliance with the North Carolina Mechanical Code, including but not limited to §§ 501.3 and 505.2;

  d.    Mr. Baggett failed to supervise and ensure that all design work and construction work performed by subcontractors would not be defective; and

  e.    Mr. Baggett failed to perform all necessary inspections and/or testing to ensure that design and construction was performed in a good and workmanlike manner and in accordance with applicable regulations, standards, and codes; with respect to Allure's subcontractors, specifically including CCA.

73.     A violation of the North Carolina Mechanical Code constitutes negligence *per se*.

74.     Mr. Baggett's failures constitute a breach of his duties. As alleged, the defects in the design and/or construction of the Hall Home were latent and could not have been reasonably discovered by Plaintiffs.

75.     As a direct and proximate result of Mr. Baggett's negligence, Plaintiffs have incurred damages in an amount in excess of twenty-five thousand dollars ($25,000) plus costs and expenses as allowed by law, including those damages alleged with more particularity above. All such damages were reasonably foreseeable.

12

## FIFTH CLAIM FOR RELIEF
### (Negligence – Carolina Comfort Air, Inc.)

76.     The allegations of the preceding paragraphs are repeated here and incorporated by reference.

77.     Defendant CCA had a duty to Plaintiffs to design and install the HVAC systems in a good and workmanlike manner and in accordance with applicable regulations, standards and codes.

78.     Defendant CCA owed Plaintiffs a duty to design and install the HVAC systems such that they were free of latent defects that would ultimately cause mold growth.

79.     Defendant CCA failed to exercise ordinary and reasonable care in the design and/or installation of the HVAC systems and in determining whether the HVAC systems that it designed and installed contained a latent defect that would result in the failure of the HVAC systems to safely perform as reasonably expected.

80.     Defendant CCA designed and/or installed HVAC systems in the Hall Home that failed to comply with the North Carolina Mechanical Code, including but not limited to §§ 501.3 and 505.2.

81.     A violation of the North Carolina Mechanical Code constitutes negligence *per se.*

82.     Defendant CCA's failure to exercise ordinary and reasonable care and negligence *per se*, as aforesaid, proximately caused damages to Plaintiffs.

83.     Plaintiffs have incurred damages in an amount in excess of twenty-five thousand dollars ($25,000) plus costs and expenses as allowed by law, including those damages alleged with more particularity above.  All such damages were reasonably foreseeable.

## SIXTH CLAIM OF RELIEF
### (Negligence- Newcomb)

84.     The allegations of the preceding paragraphs are repeated here and incorporated by reference.

85.     Defendant Newcomb owed Plaintiffs a duty to use reasonable care and to properly inspect, maintain, and repairs as necessary, the HVAC systems of the Hall Home, and to report any defects in the systems, including visible mold growth.

86.     Defendant Newcomb had a duty to perform its inspection, maintenance, and repair in conformance with all applicable regulations, standards, and codes and with industry standards.

87.     From 2016 to 2018, Defendant Newcomb repeatedly failed to exercise ordinary and reasonable care in the inspection and maintenance of the HVAC systems and/or failed to disclose to the Plaintiffs the presence of mold growth in the HVAC systems of the Hall Home.

88.     Defendant Newcomb's failure to exercise ordinary and reasonable care, as aforesaid, proximately caused damages to Plaintiffs.

89.     As a direct and proximate result of Defendant Newcomb's negligence, Plaintiffs have incurred damages in an amount in excess of twenty-five thousand dollars ($25,000) plus costs and expenses as allowed by law, including those damages alleged with more particularity above.  All such damages were reasonably foreseeable.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully pray to the Court as follows:

1.     That Plaintiffs have and recover against Defendants, jointly and severally, an amount in excess of $25,000.00, said amount to be proven at the trial of this action;

2.     That the costs of this action be taxed against Defendants, jointly and severally;

3.     That Plaintiffs have a trial by jury on all issues so triable; and

4.     For such other and further relief as this Court deems just and proper.

## **PLAINTIFFS RESPECTFULLY DEMAND TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Respectfully submitted, this the 27th day of October, 2020.

EVERETT GASKINS HANCOCK LLP

E.D. Gaskins, Jr.
N.C. Bar No. 1606
ed@eghlaw.com
Katherine A. King
N.C. Bar No. 44525
katie@eghlaw.com
220 Fayetteville Street, Suite 300
P.O. Box 911
Raleigh, NC 27602
Telephone: (919) 755-0025
Facsimile: (919) 755-0009
Attorneys for Plaintiffs

dotloop signature verification: www.dotloop.com/my/verification/DL-65678365-7-3DLJ



EXHIBIT

*A*

## OFFER TO PURCHASE AND CONTRACT—NEW CONSTRUCTION
[Consult "Guidelines" (Standard Form 800G) for guidance in completing this form]
**[This form is designed for use when licensed contractor is constructing or will construct a "spec" or custom single-family dwelling on land owned or to be owned by contractor and then convey improved land to buyer. It is not for use when: (1) the contractor is not Seller, (2) Buyer owns the land or (3) Buyer will provide financing for construction.]**

For valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, Buyer offers to purchase and Seller upon acceptance agrees to sell and convey the Property on the terms and conditions of this Offer To Purchase and Contract—New Construction and any addendum or modification made in accordance with its terms (together the "Contract").

1.  **TERMS AND DEFINITIONS:** The terms listed below shall have the respective meaning given them as set forth adjacent to each term.

(a) **"Seller"**: Allure Homes, LLC
NC contractor's license #: 662427          classification: Building          limit: unlimited

(b) **"Buyer"**: Marcus S. & Alisa M.  Hall

(c) **"Real Estate"**: The Real Estate shall include all that certain lot or parcel of land described below together with all appurtenances thereto.
Street Address: 4913 Yadkin Drive
City: Raleigh                                                                         Zip 27609
County: Wake                                        , North Carolina
**(NOTE:** Governmental authority over taxes, zoning, school districts, utilities and mail delivery may differ from address shown.)

Legal Description: (Complete *ALL* applicable)
Plat Reference: Lot 28          , Block/Section _____ , Subdivision North Hills Estates
                                                       , as shown on Plat Book/Slide _____ at Page(s) _____
The PIN/PID or other identification number of the Real Estate is: 1706236948                                   .
Other description: _____
Some or all of the Real Estate may be described in Deed Book 15340          at Page 2785                    .

(d) **"Purchase Price"**:

$ 1,041,000          Paid in U.S. Dollars upon the following terms (to be adjusted by allowance and Change Orders as defined in Paragraph 3(b)(iii)):

$ N/A          BY INITIAL EARNEST MONEY DEPOSIT made payable to Escrow Agent named in Paragraph 1(j) ☐ with this offer OR ☐ delivered within five (5) days of the Effective Date of this Contract by ☐ cash ☐ personal check ☐ official bank check ☐ wire transfer

$ N/A          BY (ADDITIONAL) EARNEST MONEY DEPOSIT made payable to Escrow Agent named in Paragraph 1(j) by cash or immediately available funds such as official bank check or wire transfer to be delivered to Escrow Agent no later than N/A                                                                    ,
***TIME BEING OF THE ESSENCE*** with regard to said date.

$ N/A          BY SELLER FINANCING in accordance with the attached Seller Financing Addendum.

$ 104,100          BY BUILDING DEPOSIT made payable to Seller in accordance with the terms of subparagraph (l) below

$ 936,900          BALANCE of the Purchase Price in cash at Settlement (some or all of which may be paid with the proceeds of a new loan)

Whenever the final cost for allowances is more or less than the allowances set forth in this Contract or any addendum to this Contract and whenever there are Change Orders which change the cost for the Dwelling, the difference shall be adjusted between the parties either prior to Settlement or at Settlement. The Purchase Price shall be the complete cost for the Property.

Page 1 of 12

This form jointly approved by:
North Carolina Bar Association
North Carolina Association of REALTORS®, Inc.

REALTOR®


EQUAL HOUSING OPPORTUNITY

STANDARD FORM 800-T
Revised 7/2013
© 7/2013

Buyer initials [MSH 06/12/14] [AMH 06/12/14]          Seller initials [PB 06/23/14] [     ]

dotloop signature verification: www.dotloop.com/my/verification/DL-656703GS-7-3DLI

Should Buyer fail to deliver any Initial Earnest Money Deposit by their due dates, or should any check or other funds paid by Buyer be dishonored, for any reason, by the institution upon which the payment is drawn, Buyer shall have one (1) banking day after written notice to deliver cash or immediately available funds to the payee. In the event Buyer does not timely deliver cash or immediately available funds, Seller shall have the right to terminate this Contract upon written notice to Buyer.

(e) **"Pre-Construction Evaluation Period"**: The period beginning on the Effective Date and extending through N/A _____ *TIME BEING OF THE ESSENCE* with regard to said date.

(f) **"Dwelling"**: Seller shall complete construction of a single family dwelling and related improvements to be constructed on the Real Estate in accordance with the Plans and Specifications agreed to by Seller and Buyer.

(g) **"Property"**: The Property shall mean the Real Estate described in 1(c) plus the Dwelling described in 1(f).

(h) **"Plans and Specifications"**: **NOTE: All site plans, drawings, floor plans, landscape plans, schedule of allowances, description of materials and specification lists should either be listed with copies attached as exhibits OR described with specificity (title of document, date, number of pages, designer, etc.) so they can be clearly identified and referenced:**

KDK Hall Residence Plans, Allure Home Hall Residence Specs, & Survey

(i) **"Earnest Money Deposit"**: The Initial Earnest Money Deposit, the Additional Earnest Money Deposit and any other earnest monies paid in connection with this transaction, hereinafter collectively referred to as "Earnest Money Deposit", shall be deposited and held in escrow by Escrow Agent until Closing, at which time it will be credited to Buyer, or until this Contract is otherwise terminated. In the event: (1) this offer is not accepted; or (2) a condition of any resulting contract is not satisfied, then the Earnest Money Deposit shall be refunded to Buyer. In the event of breach of this Contract by Seller, the Earnest Money Deposit shall be refunded to Buyer upon Buyer's request, but such return shall not affect any other remedies available to Buyer for such breach. In the event of breach of this Contract by Buyer, then without limiting any other remedies available to Seller for such breach, the Earnest Money Deposit shall be applied to such damages as Seller may be legally entitled to recover for such breach, and the balance of the Earnest Money Deposit, if any, shall be refunded to Buyer upon Buyer's request. If legal proceedings are brought by Buyer or Seller against the other to recover the Earnest Money Deposit, the prevailing party in the proceeding shall be entitled to recover from the non-prevailing party reasonable attorney fees and court costs incurred in connection with the proceeding.

(j) **"Escrow Agent"** (insert name): N/A _____

**NOTE:** In the event of a dispute between Seller and Buyer over the disposition of the Earnest Money Deposit held in escrow, a licensed real estate broker ("Broker") is required by state law (and Escrow Agent, if not a Broker, hereby agrees) to retain the Earnest Money Deposit in the Escrow Agent's trust or escrow account until Escrow Agent has obtained a written release from the parties consenting to its disposition or until disbursement is ordered by a court of competent jurisdiction. Alternatively, if a Broker or an attorney licensed to practice law in North Carolina ("Attorney") is holding the Earnest Money Deposit, the Broker or Attorney may deposit the disputed monies with the appropriate clerk of court in accordance with the provisions of N.C.G.S. §93A-12.

THE PARTIES AGREE THAT A REAL ESTATE BROKERAGE FIRM ACTING AS ESCROW AGENT MAY PLACE THE EARNEST MONEY DEPOSIT IN AN INTEREST BEARING TRUST ACCOUNT AND THAT ANY INTEREST EARNED THEREON SHALL BE DISBURSED TO THE ESCROW AGENT MONTHLY IN CONSIDERATION OF THE EXPENSES INCURRED BY MAINTAINING SUCH ACCOUNT AND RECORDS ASSOCIATED THEREWITH.

(k) **"Effective Date"**: The date that: (i) the last one of Buyer and Seller has signed or initialed this offer or the final counteroffer, if any, and (ii) such signing or initialing is communicated to the party making the offer or counteroffer, as the case may be.

(l) **"Building Deposit"**: The purpose of the Building Deposit, if any, shall be to compensate Seller for the cost of making the following special improvements: Builder Fee, Plans, Interest, Materials, Lot Clear

STANDARD FORM 800-T
Revised 7/2013
© 7/2013

Buyer initials [NEH 06/12/14] [QHH 06/12/14]  Seller initials [PB 06/23/14] [  ]

Case 5:21-cv-00096-BO   Document 1-3   Filed 02/25/21   Page 18 of 55

dotloop signature verification: www.dotloop.com/my/verification/DL-65678365-7-3DLI

The Building Deposit shall be paid to Seller (not Escrow Agent) promptly upon occurrence of both of the following events: (i) expiration of the Pre-Construction Evaluation Period and (ii) receipt by Buyer of documentary evidence of Seller's financial ability to construct the Dwelling. If the Building Deposit is to be payable in installments, the payments shall be made according to the following schedule (insert "0" or "N/A" if the Building Deposit will not be paid in installments or if no Building Deposit will be paid). NOTE: The total of any installments should equal the amount of the Building Deposit set forth in Paragraph 1(d) above, if any:

| | | |
|---|---|---|
| $20,000 | Date or event triggering payment: | Lot Deposit |
| $84,100 | Date or event triggering payment: | 06/05/2014 |
| $ | Date or event triggering payment: | |
| $ | Date or event triggering payment: | |

**The Building Deposit is not a part of the Earnest Money Deposit and will be used by Seller in the construction of the special improvements described above.** The Building Deposit will be credited to the Purchase Price at Settlement. The Building Deposit shall be refundable only in the event of a material breach of the Contract by Seller, or if this Contract is terminated under paragraph 13.

Should Buyer fail to deliver the Building Deposit or any installment thereof in accordance with the terms of this subparagraph, Buyer shall have seven (7) days after written notice to deliver the Building Deposit or the installments to Seller. In the event Buyer does not timely deliver the Building Deposit, Seller shall have the right to terminate this Contract upon written notice to Buyer.

(**WARNING**: In determining whether and how much Building Deposit Buyer is willing to pay, Buyer should carefully consider that even though Buyer may be legally entitled to a refund of the Building Deposit in the event of a material breach of this Contract by Seller, actual recovery of the Building Deposit may be difficult, time-consuming and/or costly if Seller is unable or unwilling to voluntarily refund the Building Deposit.)

(m) "**Settlement**": The proper execution and delivery to the closing attorney of all documents necessary to complete the transaction contemplated by this Contract, including the deed, settlement statement, deed of trust and other loan or conveyance documents, and payment of all funds necessary to complete such transaction.

(n) "**Settlement Date**" The parties agree that Settlement will take place on 04/06/2015 (the "Settlement Date"), unless otherwise agreed in writing, at a time and place designated by Buyer. The parties acknowledge and understand that Settlement may be delayed for a number of reasons, including but not limited to: (i) an extension of the Pre-Construction Evaluation Period under paragraph 2(e); (ii) a delay in construction under paragraph 3(g); (iii) an unsatisfactory title update or the closing attorney's lack of authority to disburse funds under paragraph 1(o); or (iv) Seller's failure to perform any required correction, repair, treatment or remediation or other work that may be required under paragraph 4. In the event of a delay in Settlement, the Settlement Date will be extended by a reasonable time to account for the delay(s) experienced. Unless otherwise agreed in writing, there must be Substantial Completion of the Dwelling on or before the Settlement Date.

(o) "**Closing**": The completion of the legal process which results in the transfer of title to the Property from Seller to Buyer. Closing includes the following steps: (1) the Settlement (defined above); (2) the completion of a satisfactory title update to the Property following the Settlement; (3) the closing attorney's receipt of authorization to disburse all necessary funds; and (4) recordation in the appropriate county registry of the deed(s) and deed(s) of trust, if any, which shall take place as soon as reasonably possible for the closing attorney after Settlement. Upon Closing, the proceeds of sale shall be disbursed by the closing attorney in accordance with the settlement statement and the provisions of Chapter 45A of the North Carolina General Statutes. If the title update should reveal unexpected liens, encumbrances or other title defects, or if the closing attorney is not authorized to disburse the lender's funds, then the Closing shall be suspended and the Settlement deemed delayed.

**WARNING**: The North Carolina State Bar has determined that the performance of most acts and services required for a closing constitutes the practice of law and must be performed only by an attorney licensed to practice law in North Carolina. State law prohibits unlicensed individuals or firms from rendering legal services or advice. Although non-attorney settlement agents may perform limited services in connection with a closing, they may not perform all the acts and services required to complete a closing. A closing involves significant legal issues that should be handled by an attorney. Accordingly it is the position of the North Carolina Bar Association and the North Carolina Association of REALTORS® that all buyers should hire an attorney licensed in North Carolina to perform a closing.

STANDARD FORM 800-T
Revised 7/2013
© 7/2013

(p) **"Special Assessments"**: A charge against the Property by a governmental authority in addition to ad valorem taxes and recurring governmental service fees levied with such taxes, or by an owners' association in addition to any regular assessment (dues), either of which may be a lien against the Property. A Special Assessment may be either proposed or confirmed.

**"Proposed Special Assessment"**: A Special Assessment that is under formal consideration but which has not been approved prior to Settlement.

**"Confirmed Special Assessment"**: A Special Assessment that has been approved prior to Settlement whether or not it is fully payable at time of Settlement.

(q) **"Substantial Completion"**: The completion of the construction of the Dwelling in accordance with the Plans and Specifications and any other special provisions that may be part of the Contract to the degree that: (i) it is habitable and broom-clean, (ii) a certificate of occupancy has been issued by the appropriate governmental authority having jurisdiction over the construction of the Dwelling and delivered to Buyer, and (iii) only Punch List Items remain to be corrected.

2.  **CONDITIONS APPLICABLE DURING PRE-CONSTRUCTION EVALUATION PERIOD**: During the Pre-Construction Evaluation Period, the following conditions shall apply:
    (a) **Buyer Loan Condition:** ☑Not Applicable
    Unless not applicable, Buyer's performance is contingent upon Buyer's ability to obtain a ☐ FHA ☐ VA (attach FHA/VA Financing Addendum) ☐ Conventional ☐ Other: _____ loan at a ☐ Fixed Rate ☐ Adjustable Rate in the principal amount of _____ plus any financed VA Funding Fee or FHA MIP for a term of _____ year(s), at an initial interest rate not to exceed _____% per annum, with mortgage loan discount points not to exceed _____ % and with loan origination fee not to exceed _____% of the loan amount ("Loan"). Buyer agrees pursue qualification for and approval of the Loan diligently and in good faith. Prior to the expiration of the Pre-Construction Evaluation Period, *TIME BEING OF THE ESSENCE*, Buyer shall have the right to terminate this Contract by delivering to Seller written notice of termination if Buyer, in Buyer's sole discretion, is not satisfied that the Loan will be approved and funded. If Buyer has timely delivered such notice, this Contract shall be terminated and all Earnest Money shall be refunded to Buyer. If Buyer fails to deliver such notice, then Buyer will be deemed to have waived this condition. Buyer shall provide documentary evidence to Seller that Buyer can obtain the Loan.

    (b) **Seller Loan Condition:** ☑Not Applicable
    Unless not applicable, Seller's performance is contingent upon Seller's ability to obtain such financing as may be necessary to perform Seller's obligations under this Contract. Seller agrees to pursue qualification for and approval of such financing diligently and in good faith. Prior to the expiration of the Pre-Construction Evaluation Period, *TIME BEING OF THE ESSENCE*, Seller shall have the right to terminate this Contract by delivering to Buyer written notice of termination if Seller, in Seller's sole discretion, is not satisfied that Seller will be able to obtain financing necessary to perform Seller's obligations under this Contract or financing upon such terms that are acceptable to Seller. If Seller has timely delivered such notice, this Contract shall be terminated and all Earnest Money shall be refunded to Buyer. If Seller fails to deliver such notice, then Seller will be deemed to have waived this condition. Seller shall provide documentary evidence to Buyer of Seller's financial ability to construct the Dwelling.

    (c) **Reports:** This Contract is contingent upon Seller obtaining the following applicable report(s) or permits (collectively the "Reports"):
    (i) **Soil Suitability** (☐Applicable ☑Not Applicable): The soil is suitable for the Dwelling.
    (ii) **Utility Availability** (☐ Applicable ☑ Not Applicable): The following utilities are available to the Property: _____.
    (iii) **Environmental Restrictions** (☐ Applicable ☐ Not Applicable): There is no environmental contamination, law, rule or regulation that prohibits or unreasonably limits the use of the Property for residential purposes.
    (iv) **Environmental Permits** (☐ Applicable ☑ Not Applicable): An Improvement Permit from any environmental regulatory agency which may have jurisdiction concerning the Real Estate which would allow the construction of the Dwelling.
    (v) **Flood Hazard** (☐Applicable ☑ Not Applicable): There is no flood hazard that prohibits or unreasonably limits the use of the Property for residential purposes.
    (vi) **Septic System** (☐Applicable ☑ Not Applicable): An Improvement Permit or written evaluation from the County Health Department ("County") for a (check only ONE) ☐ conventional or ☐ other _____ _____ ground absorption sewage system for a _____ bedroom home.

Page 4 of 12

STANDARD FORM 800-T
Revised 7/2013
© 7/2013

dotloop signature verification: www.dotloop.com/my/verification/DL-65678365-7-3DLI

(vii) **Private Drinking Water Well** (☐ Applicable ☑ Not Applicable): A Construction Permit from the County Health Department ("County") for a private drinking water well.

(viii) **Zoning/Restrictive Covenants** (☐ Applicable ☑ Not Applicable): The Dwelling may be constructed in accordance with applicable zoning and restrictive covenants.

(ix) **Architectural Review** (☐ Applicable ☑ Not Applicable): Approval from architectural review board/committee that the Dwelling meets applicable architectural requirements.

All costs and expenses of obtaining the Reports shall be borne by Seller, and Seller shall use best efforts to timely obtain the Reports and provide copies of them to Buyer. If the Reports cannot be obtained by the expiration of the Pre-Construction Evaluation Period, either party may terminate this Contract by delivering to the other party written notice of termination within three (3) days following the expiration of the Pre-Construction Evaluation Period, *TIME BEING OF THE ESSENCE*. If the terminating party has timely delivered such notice, this Contract shall be terminated and all Earnest Money shall be refunded to Buyer. If neither party delivers such notice, then the parties will be deemed to have waived this condition.

(d) **Insurance Availability/Affordability Condition:**
☐ (i) **Casualty Insurance:** (*if checked, the following terms apply*). Buyer must be able to obtain the insurance set forth in subparagraph (a) or (b) below at a rate not exceeding One Hundred Fifty Percent (150%) of the "Base Rate" for such insurance as filed by the NC Rate Bureau with the NC Department of Insurance.
(*Check the appropriate box*)
☐(a) Buyer intends to occupy the Dwelling as Buyer's primary residence, and must be able to obtain insurance on the Property with coverage at least equivalent to that contained in a Homeowners 2 - Broad Form policy (also known as an HO2 policy) without optional coverages.
☐ (b) Buyer does not intend to occupy the Dwelling as Buyer's primary residence and must be able to obtain insurance on the Property with coverage at least equivalent to that contained in a Dwelling Property 2 - Broad Form policy (also known as a DP2 policy) without optional coverages.
☐ (ii) **Flood Insurance:** (*if checked, the following terms apply*). Buyer must be able to obtain Flood Insurance on the proposed Dwelling through the Federal Environmental Management Act Program.
(iii) **Termination:** If either subparagraph (i) or (ii) or both, above, have been checked, then prior to the expiration of the Pre-Construction Evaluation Period, *TIME BEING OF THE ESSENCE*, Buyer shall have the right to terminate this Contract by delivering to Seller written notice of termination if Buyer, in Buyer's sole discretion, is not satisfied that Buyer will be able to obtain insurance of the type and at the rate described above. If Buyer has timely delivered such notice, this Contract shall be terminated and all Earnest Money shall be refunded to Buyer. If Buyer fails to deliver such notice, then Buyer will be deemed to have waived this condition.

(e) **Extension:** *TIME IS OF THE ESSENCE* REGARDING THE EXPIRATION OF THE PRE-CONSTRUCTION EVALUATION PERIOD. The parties may, but are not required to, agree to extend the Pre-Construction Evaluation Period. Any extension of the Pre-Construction Evaluation must be in writing and signed by the parties. In the event of an extension, the Settlement Date shall be extended by the same period of time that the Pre-Construction Evaluation Period has been extended.

(NOTE: The failure of a party to terminate this Contract based upon a condition contained in this Pre-Construction Evaluation Period paragraph shall not constitute a waiver of or otherwise affect any other rights that the party may have under this Contract.)

3. **CONSTRUCTION OF DWELLING.**
(a) **Quality of Construction:** Seller shall construct the Dwelling (i) in accordance with the Plans and Specifications; (ii) in compliance with all laws, regulations, codes, and ordinances applicable to the construction of the Dwelling; and (iii) in a good and workmanlike manner with new, good quality materials and components.

(b) **Changes:**
(i) **Seller Changes:** Seller shall not make any significant deviation or change in the Plans and Specifications without the prior written consent of Buyer.
(ii) **Buyer Changes:** Buyer may request changes in the construction of the Dwelling within the general scope of the Plans and Specifications, consisting of additions, deletions or other revisions.
(iii) **Change Order:** Changes under (i) and/or (ii) above shall be made only by a Change Order, which shall be in writing and signed by both Buyer and Seller ("Change Order"). Any adjustments in the Purchase Price, Building Deposit and Settlement date shall be as set forth in the Change Order.

(c) **Construction Costs:** Seller shall provide and pay for all labor, materials, equipment, tools, clean-up, utilities, transportation, facilities, permits, fees, licenses, all plans and specifications and all other costs, charges and expenses whatsoever in connection with or related to the construction of the Dwelling unless otherwise agreed in writing.

**STANDARD FORM 800-T**
**Revised 7/2013**
© 7/2013

dotloop signature verification: www.dotloop.com/my/verification/DL-65678365-7-3DLI

(d) **Construction Financing:** Seller shall pay all costs, charges, and other expenses, of any nature whatsoever, for Seller's construction financing of the Dwelling.

(e) **Building Permit:** Within _____ days after the expiration of the Pre-Construction Evaluation Period, Seller will obtain the building permit for the construction of the Dwelling. **With respect to this deadline, *TIME* ☐ *IS* ☑ *IS NOT OF THE ESSENCE*.** Construction of the Dwelling shall commence upon issuance of the building permit and necessary land use permits.

(f) **Punch List Items:**
(i) Seller shall notify Buyer when there has been Substantial Completion of the Dwelling and shall schedule a mutually agreeable date and time on which Buyer shall inspect the Dwelling. Prior to Settlement, Buyer and Seller shall agree upon a written list of all deficiencies in workmanship and material that are detectable by visual examination ("Punch List Items"). Seller shall correct Punch List Items at Seller's cost within a reasonable period of time. AFTER SUBSTANTIAL COMPLETION(as defined in Paragraph 1(q)), SELLER'S FAILURE TO CORRECT A PUNCH LIST ITEM PRIOR TO SETTLEMENT WILL NOT BE GROUNDS FOR DELAYING SETTLEMENT OR THE IMPOSITION OF ANY CONDITIONS ON SETTLEMENT; PROVIDED, SETTLEMENT SHALL NOT RELIEVE SELLER FROM THE OBLIGATION TO CORRECT ANY PUNCH LIST ITEM.
(ii) This subparagraph (f) shall not be deemed to limit Buyer's right to conduct inspections under Paragraph 4 below or limit the obligations of Seller under the Limited Warranty of Construction under Paragraph 5 below.

(g) **Delay in Construction:** If Seller is delayed at any time in the progress of construction by (i) any act or neglect of Buyer; (ii) written Change Orders; (iii) shortages of materials, adverse weather conditions, or delays in transportation which were not reasonably anticipated; or (iv) acts of God, Seller shall give as much notice as possible of the delay to Buyer and the time for Substantial Completion of construction of the Dwelling and the Settlement Date shall be extended by a reasonable time to account for the delay(s) experienced. BUYER ACKNOWLEDGES AND UNDERSTANDS THE IMPORTANCE OF COOPERATING FULLY WITH SELLER IN ORDER TO HELP EXPEDITE THE CONSTRUCTION OF THE DWELLING AND TO AVOID OR MINIMIZE ANY DELAY IN SETTLEMENT, INCLUDING BUT NOT LIMITED TO TIMELY COMMUNICATION OF ANY REQUESTED CHANGES IN THE CONSTRUCTION OF THE DWELLING IN ACCORDANCE WITH PARAGRAPH 3(b)(ii) ABOVE AND MAKING PROMPT DECISIONS ON ANY ALLOWANCE ITEMS.

4. **BUYER'S INVESTIGATION OF CONSTRUCTION:**
(a) **Inspections:** Buyer or Buyer's designated representative may enter the Dwelling at reasonable times through the earlier of Closing or possession by Buyer, in such manner as not to interfere with the progress of construction, for the purpose of conducting such inspections as Buyer deems appropriate to determine whether the work performed or being performed conforms with the Plans and Specifications and the terms of this Contract. In the event that during construction Buyer shall reasonably determine that such construction is not proceeding in accordance with this Contract, Buyer shall give written notice to Seller specifying the particular deviation, deficiency, or omission, and Seller shall forthwith correct such deviation, deficiency, or omission. Buyer's rights under this paragraph shall not release Seller from any of Seller's obligations for the construction of the Dwelling in accordance with the Plans and Specifications and this Contract.

(b) **Wood-Destroying Insects:** Buyer shall have the option of obtaining, at Buyer's expense, prior to Settlement, a report from a licensed pest control operator on a standard form in accordance with the regulations of the North Carolina Structural Pest Control Committee, stating that as to the Dwelling there was no visible evidence of wood-destroying insects and containing no indication of visible damage therefrom. If the report indicates that there is visible evidence of wood-destroying insects or visible damage therefrom, Seller shall perform any required treatment and make any necessary repairs. **Buyer is advised that the inspection report described in this paragraph may not always reveal either structural damage or damage caused by agents or organisms other than wood-destroying insects.** Seller shall provide a standard warranty of termite soil treatment.

(c) **Radon Inspection:** Buyer shall have the option, at Buyer's expense, to have the Property tested for radon prior to Settlement. The test result shall be deemed satisfactory to Buyer if it indicates a radon level of less than 4.0 pico curies per liter of air **(as of January 1, 1997, EPA guidelines reflect an "acceptable" level as anything less than 4.0 pico curies per liter of air)**. If the test result exceeds the above-mentioned level, Seller shall remediate to bring the radon level within the satisfactory range. Upon the completion of remediation, Buyer may have a radon test performed at Seller's expense, and if the test result indicates a radon level less than 4.0 pico curies per liter of air, it shall be deemed satisfactory to Buyer.

(d) **Delay in Settlement:** Seller's failure to perform any required correction, repair, treatment or remediation or other work that may be required under this paragraph 4 prior to Settlement will be grounds for delaying Settlement.

STANDARD FORM 800-T
Revised 7/2013
© 7/2013

dotloop signature verification: www.dotloop.com/my/verification/DL-65678365-7-3DLI

(e) **Buyer's Obligation to Repair Damage:** Buyer shall, at Buyer's expense, promptly repair any damage to the Property resulting from any activities of Buyer and Buyer's agents and contractors, but Buyer shall not be responsible for any damage caused by accepted practices either approved by the NC Home Inspector Licensure Board or applicable to any other NC licensed professional performing reasonable appraisals, tests, surveys, examinations and inspections of the Property.

(f) **Indemnity:** Buyer will indemnify and hold Seller harmless from all loss, damage, claims, suits or costs, which shall arise out of any contract, agreement, or injury to any person or property as a result of any activities of Buyer and Buyer's agents and contractors relating to the Property except for any loss, damage, claim, suit or cost arising out of pre-existing conditions of the Property and/or out of Seller's negligence or willful acts or omissions. This repair obligation and indemnity shall survive this Contract and any termination hereof.

5. **WARRANTIES:**
(a) **Limited Warranty Of Construction.** Unless otherwise provided for herein, Seller hereby warrants that, for a period of one (1) year from the date of Closing or the date Buyer occupies the Dwelling, whichever comes first, Seller will make all necessary repairs and corrections to the Dwelling, either interior or exterior, structural or nonstructural, that shall become necessary by reason of faulty construction, labor or materials or non-conformity of construction to the Plans and Specifications. At Seller's sole option, Seller may either (i) make such repairs and corrections, (ii) replace any faulty or non-conforming item or condition or (iii) pay to Buyer the reasonable cost of such repair, correction or replacement. This limited warranty: (1) is for the benefit of Buyer only and may not be assigned nor shall it inure to the benefit of any other person or entity, and (2) shall survive Closing and the delivery of the deed. ☐ If checked, the foregoing Limited Warranty shall not apply and is replaced by the attached written warranty from Seller.

(b) **Warranties Of Components.** Seller shall assign and deliver to Buyer at Settlement all guarantees and warranties of all components comprising the Dwelling to the extent the same are assignable. Buyer shall be responsible for compliance with any notice and claim procedures set forth therein. Seller's warranty under Paragraph 5(a) shall not extend to any such component expressly guaranteed or warranted by the manufacturer.

6. **INSULATION OF DWELLING:**

| | WALLS | CEILINGS | FLOORS |
|---|---|---|---|
| **TYPE** | Fiberglass | Fiberglass | Fiberglass |
| **THICKNESS** | 3 1/2" | 11" | 9 1/4" |
| **R-VALUE** | R-15 | R-38/30 | R-19 |

7. **BUYER REPRESENTATIONS:**
(a) **Other Property:** Buyer ☐ does ☑ does not have to sell or lease other real property in order to qualify for a new loan or to complete the purchase of the Property. (**WARNING:** This does not create a contingent sale condition. The Contingent Sale Addendum (Form 2A2-T) is not designed for use with this Contract and should not be used. If a contingent sale condition is desired, consult a NC real estate attorney.)

(b) **Performance of Buyer's Financial Obligations:** To the best of Buyer's knowledge, there are no other circumstances or conditions existing as of the date of this offer that would prohibit Buyer from performing Buyer's financial obligations in accordance with this Contract, except as may be specifically set forth herein.

8. **BUYER OBLIGATIONS:**
(a) **Owner Association Fees/Charges:** Buyer shall pay any fees required for obtaining account payment information on owners' association dues or assessments for payment or proration and any charge made by the owners' association in connection with the disposition of the Property to Buyer, including any transfer and/or document fee imposed by the owners' association.

(b) **Responsibility for Proposed Special Assessments:** Buyer shall take title subject to all Proposed Special Assessments.

(c) **Responsibility for Certain Costs:** Buyer shall be responsible for all costs with respect to any loan obtained by Buyer, appraisal, title search, title insurance, recording the deed and for preparation and recording of all instruments required to secure the balance of the Purchase Price at Settlement.

9. **SELLER REPRESENTATIONS:**
(a) **Ownership:** Seller represents that Seller:
☑ has owned the Real Estate for at least one year;

STANDARD FORM 800-T
Revised 7/2013
© 7/2013

Buyer initials _NBH_ _QHH_  Seller initials _PB_

dotloop signature verification: www.dotloop.com/my/verification/DL-65678365-7-3DU

☐ has owned the Real Estate for less than one year
☐ does not yet own the Real Estate

(b) **Assessments:** To the best of Seller's knowledge there are no Proposed Special Assessments except as follows (Insert "None" or the identification of such assessments, if any):None

Seller warrants that there are no Confirmed Special Assessments except as follows (Insert "None" or the identification of such assessments, if any):None

(c) **Contractor's License:** Seller represents that Seller is licensed to construct the improvements on the Real Estate.

(d) **Owners' Association(s) and Dues**: To best of Seller's knowledge, ownership of the Property ☐ subjects ☑ does not subject Buyer to regulation by one or more owners' association(s) and governing documents, which impose various mandatory covenants, conditions and restrictions upon the Property and Buyer's enjoyment thereof, including but not limited to obligations to pay regular assessments (dues) and Special Assessments. If there is an owners' association, then an Owners' Association Disclosure and Addendum For Properties Exempt from Residential Property Disclosure Statement (Standard Form 2A12-T) shall be completed by Seller, at Seller's expense, and must be attached as an addendum to this Contract.

(e) **OIL AND GAS RIGHTS DISCLOSURE:**
**Oil and gas rights can be severed from the title to real property by conveyance (deed) of the oil and gas rights from the owner or by reservation of the oil and gas rights by the owner. If oil and gas rights are or will be severed from the property, the owner of those rights may have the perpetual right to drill, mine, explore, and remove any of the subsurface oil or gas resources on or from the property either directly from the surface of the property or from a nearby location. With regard to the severance of oil and gas rights, Seller makes the following disclosures:**

| | | Yes | No | No Representation |
|---|---|---|---|---|
| 1. | Oil and gas rights were severed from the property by a previous owner. | ☐ | ☐ | ☑ |

| | | Yes | No |
|---|---|---|---|
| 2. | Seller has severed the oil and gas rights from the property. | ☐ | ☑ |
| 3. | Seller intends to sever the oil and gas rights from the property prior to transfer of title to Buyer. | ☐ | ☑ |

This disclosure does not modify or limit the obligations of Seller under Paragraph 10(f) of this Contract and shall not constitute the assumption or approval by Buyer of any severance of oil and gas rights, except as may be assumed or specifically approved by Buyer in writing.

**(NOTE: The parties are advised to consult with a NC attorney prior to signing this Contract if severance of oil and gas rights has occurred or is intended.)**

10. **SELLER OBLIGATIONS:** In addition to Seller's obligation to construct the Dwelling in accordance with paragraph 3 above, Seller shall have the following additional obligations:

(a) **Evidence Of Title:** Seller agrees to use best efforts to deliver to Buyer as soon as reasonably possible after the Effective Date, copies of all title information in possession of or available to Seller, including but not limited to: title insurance policies, attorney's opinions on title, surveys, covenants, deeds, notes and deeds of trust, leases, and easements relating to the Property. Seller authorizes: (1) any attorney presently or previously representing Seller to release and disclose any title insurance policy in such attorney's file to Buyer and both Buyer's and Seller's agents and attorneys; and (2) the Property's title insurer or its agent to release and disclose all materials in the Property's title insurer's (or title insurer's agent's) file to Buyer and both Buyer's and Seller's agents and attorneys.

(b) **Access to Property/Walk-Through Inspection:** Seller shall provide reasonable access to the Property (including working, existing utilities) through the earlier of Closing or possession by Buyer, including, but not limited to, allowing the Buyer an opportunity to conduct a final walk-through inspection of the Property.

(c) **Removal of Seller's Property:** Seller shall remove, by the date possession is made available to Buyer, all personal property which is not a part of the purchase and all garbage and debris from the Property.

STANDARD FORM 800-T
Revised 7/2013
© 7/2013

Case 5:21-cv-00096-BO    Document 1-3    Filed 02/25/21    Page 24 of 55

Buyer initials _____ _____     Seller initials _____

dotloop signature verification: www.dotloop.com/my/verification/DL-656/8365-7-3DU

(d) **Affidavit And Indemnification Agreement**: Seller shall furnish at Settlement an affidavit(s) and indemnification agreement(s) in form satisfactory to Buyer and Buyer's title insurer, if any, executed by Seller and any person or entity who has performed or furnished labor, services, materials or rental equipment to the Property within 120 days prior to the date of Settlement and who may be entitled to claim a lien against the Property as described in N.C.G.S. §44A-8 verifying that each such person or entity has been paid in full and agreeing to indemnify Buyer, Buyer's lender(s) and Buyer's title insurer against all loss from any cause or claim arising therefrom.

(e) **Designation of Lien Agent, Payment and Satisfaction of Liens**: If required by N.C.G.S. §44A-11.1, Seller shall have designated a Lien Agent, and Seller shall deliver to Buyer as soon as reasonably possible a copy of the appointment of Lien Agent. All deeds of trust, deferred ad valorem taxes, liens and other charges against the Property, not assumed by Buyer, must be paid and satisfied by Seller prior to or at Settlement such that cancellation may be promptly obtained following Closing. Seller shall remain obligated to obtain any such cancellations following Closing.

(f) **Good Title, Legal Access**: Seller shall execute and deliver a GENERAL WARRANTY DEED for the Property in recordable form no later than Settlement, which shall convey fee simple marketable and insurable title, without exception for mechanics' liens, and free of any other liens, encumbrances or defects, including those which would be revealed by a current and accurate survey of the Property, except: ad valorem taxes for the current year (prorated through the date of Settlement); utility easements and unviolated covenants, conditions or restrictions that do not materially affect the value of the Property; and such other liens, encumbrances or defects as may be assumed or specifically approved by Buyer in writing. The Property must have legal access to a public right of way.

(g) **Deed, Excise Taxes**: Seller shall pay for preparation of a deed and all other documents necessary to perform Seller's obligations under this agreement, and for state and county excise taxes required by law. The deed is to be made to:Marcus S. & Alisa M. Hall

(h) **Agreement to Pay Buyer Expenses**: Seller shall pay at Settlement $N/A toward any of Buyer's expenses associated with the purchase of the Property, including any FHA/VA lender and inspection costs that Buyer is not permitted to pay, less any portion disapproved by Buyer's lender.

(**NOTE**: Examples of Buyer's expenses associated with the purchase of the Property include, but are not limited to, discount points, loan origination fees, appraisal fees, attorney's fees, inspection fees, and "pre-paids" (taxes, insurance, HOA dues, etc.)).

(i) **Payment of Confirmed Special Assessments**: Seller shall pay all Confirmed Special Assessments, if any, provided that the amount thereof can be reasonably determined or estimated.

(j) **Late Listing Penalties**: All property tax late listing penalties, if any, shall be paid by Seller.

(k) **Owners' Association Disclosure and Addendum For Properties Exempt from Residential Property Disclosure Statement (Standard Form 2A12-T)**: If applicable, Seller shall provide the completed Owners' Association Disclosure and Addendum For Properties Exempt from Residential Property Disclosure Statement to Buyer on or before the Effective Date.

(l) **Seller's Failure to Comply or Breach**: If Seller fails to materially comply with any of Seller's obligations under this Paragraph 10 or Seller materially breaches this Contract, and Buyer elects to terminate this Contract as a result of such failure or breach, then the Earnest Money Deposit and any Building Deposit will be refunded to Buyer and Seller shall reimburse to Buyer the reasonable costs actually incurred by Buyer in connection with Buyer's qualification for and approval of any Loan and any tests, surveys, appraisals, investigations, examinations and inspections of the Property conducted by Buyer or Buyer's agents or representatives, without affecting any other remedies. If legal proceedings are brought by Buyer against the Seller to recover the Earnest Money Deposit, any Building Deposit and/or the reasonable costs actually incurred by Buyer in connection with Buyer's qualification for and approval of any Loan and any tests, surveys, appraisals, investigations, examinations and inspections of the Property conducted by Buyer or Buyer's agents or representatives, the prevailing party in the proceeding shall be entitled to recover from the non-prevailing party reasonable attorney fees and court costs incurred in connection with the proceeding.

11. **PRORATIONS AND ADJUSTMENTS:** Unless otherwise provided, the following items shall be prorated through the date of Settlement and either adjusted between the parties or paid at Settlement:
(a) Ad valorem taxes and recurring governmental service fees levied with such taxes on real property shall be prorated on a calendar year basis;
(b) Owners' association regular assessments ("dues") and other like charges.

Buyer initials ___ MSH ___ AMH ___ Seller initials ___ PB ___

dotloop signature verification: www.dotloop.com/my/verification/DL-65678365-7-3DU

12. **ADDITIONAL THIRD-PARTY HOME WARRANTY:**
☑ No additional third party home warranty is to be provided by Seller.
☐ Buyer may obtain a _____-year home warranty at a cost not to exceed $_____ and Seller agrees to pay for it at Settlement.
☐ Seller has obtained and will provide a _____-year home warranty from _____ at a cost of $_____ and will pay for it at Settlement. **NOTE**: Home warranties typically have limitations on and conditions to coverage. Refer specific questions to the home warranty company.
Any additional third party home warranty shall not limit Seller's obligations under Paragraph 5.

13. **RISK OF LOSS AND INSURANCE:**
(a) **Risk of Loss:** The risk of loss or damage by fire or other casualty prior to Closing shall be upon Seller. If the improvements on the Real Estate are destroyed or materially damaged prior to Closing, Buyer may terminate this Contract by written notice delivered to Seller or Seller's agent and all deposits shall be refunded to Buyer. In the event Buyer does NOT elect to terminate this Contract, Buyer shall be entitled to receive, in addition to the Property, any of Seller's insurance proceeds payable on account of the damage or destruction applicable to the Property being purchased. Seller is advised not to cancel existing insurance on the Property until after confirming recordation of the deed.

(b) **Insurance:** Seller shall purchase and maintain "All Risks" Builder's Risk Insurance coverage, including Theft and Vandalism and Malicious Mischief, upon the Dwelling on a "Completed Values" basis, while the Dwelling is in the course of construction. "Completed Values" shall mean the full value of the Dwelling, as of the date that all construction is completed, including Seller's total cost plus profit, but excluding the cost of the land. In the event that construction is fully completed prior to sale of the Property, Seller shall purchase and maintain Permanent "All Risks" Property Insurance coverage on the Dwelling, including Theft and Vandalism and Malicious Mischief, on a "Replacement Cost" basis. "Replacement Cost" shall mean the full cost of replacement of the structure or structures at the same site with new material of like kind and quality without deduction for depreciation. In addition, Seller shall purchase and maintain Third Party Liability Insurance coverage on the premises of the Property during the course of, and after construction is completed.

14. **POSSESSION:** Possession, including all means of access to the Property (keys, codes, garage door openers, etc.) shall be delivered upon Closing as defined in Paragraph 1(o) unless otherwise provided herein.

15. **OTHER PROVISIONS AND CONDITIONS:** CHECK ALL STANDARD ADDENDA THAT MAY BE A PART OF THIS CONTRACT, IF ANY, AND ATTACH HERETO. ITEMIZE ALL OTHER ADDENDA TO THIS CONTRACT, IF ANY, AND ATTACH HERETO. (**NOTE**: UNDER NORTH CAROLINA LAW, REAL ESTATE AGENTS ARE NOT PERMITTED TO DRAFT CONDITIONS OR CONTINGENCIES TO THIS CONTRACT.)
☐ Additional Provisions Addendum (Form 2A11-T)
☐ Schedule of Allowances Addendum (Form 800A1-T)
☐ FHA/VA Financing Addendum (Form 2A4-T)
☐ OTHER: _____
☐ Owners' Association Disclosure And Addendum For Properties Exempt from Residential Property Disclosure Statement (Form 2A12-T)
☐ Seller Financing Addendum (Form 2A5-T)
_____
_____

16. **ASSIGNMENTS:** This Contract may not be assigned without the written consent of all parties except in connection with a tax-deferred exchange, but if assigned by agreement, then this Contract shall be binding on the assignee and his heirs and successors.

17. **TAX-DEFERRED EXCHANGE:** In the event Buyer or Seller desires to effect a tax-deferred exchange in connection with the conveyance of the Property, Buyer and Seller agree to cooperate in effecting such exchange; provided, however, that the exchanging party shall be responsible for all additional costs associated with such exchange, and provided further, that a non-exchanging party shall not assume any additional liability with respect to such tax-deferred exchange. Seller and Buyer shall execute such additional documents, including assignment of this Contract in connection therewith, at no cost to the non-exchanging party, as shall be required to give effect to this provision.

18. **PARTIES:** This Contract shall be binding upon and shall inure to the benefit of Buyer and Seller and their respective heirs, successors and assigns. As used herein, words in the singular include the plural and the masculine includes the feminine and neuter genders, as appropriate.

19. **SURVIVAL:** If any provision herein contained which by its nature and effect is required to be observed, kept or performed after the Closing, it shall survive the Closing and remain binding upon and for the benefit of the parties hereto until fully observed, kept or performed.

STANDARD FORM 800-T
Revised 7/2013
© 7/2013

Buyer initials ☐ NBH ☐ QHH   Seller initials ☐ PB ☐

dotloop signature verification: www.dotloop.com/my/verification/DL-65678365-7-3DU

20. **ENTIRE AGREEMENT:** This Contract contains the entire agreement of the parties and there are no representations, inducements or other provisions other than those expressed herein. All changes, additions or deletions hereto must be in writing and signed by all parties. Nothing contained herein shall alter any agreement between a REALTOR® or broker and Seller or Buyer as contained in any listing agreement, buyer agency agreement, or any other agency agreement between them.

21. **NOTICE:** Any notice or communication to be given to a party herein may be given to the party or to such party's agent. Any written notice or communication in connection with the transaction contemplated by this Contract may be given to a party or a party's agent by sending or transmitting it to any mailing address, e-mail address or fax number set forth in the "Notice Information" section below. Seller and Buyer agree that the "Notice Information" and "Escrow Acknowledgment" sections below shall not constitute a material part of this Contract, and that the addition or modification of any information therein shall not constitute a rejection of an offer or the creation of a counteroffer.

22. **EXECUTION:** This Contract may be signed in multiple originals or counterparts, all of which together constitute one and the same instrument, and the parties adopt as their seals the word "SEAL" beside their signatures below.

23. **COMPUTATION OF DAYS:** Unless otherwise provided, for purposes of this Contract, the term "days" shall mean consecutive calendar days, including Saturdays, Sundays, and holidays, whether federal, state, local or religious. For the purposes of calculating days, the count of "days" shall begin on the day following the day upon which any act or notice as provided in this Contract was required to be performed or made.

THE NORTH CAROLINA ASSOCIATION OF REALTORS®, INC. AND THE NORTH CAROLINA BAR ASSOCIATION MAKE NO REPRESENTATION AS TO THE LEGAL VALIDITY OR ADEQUACY OF ANY PROVISION OF THIS FORM IN ANY SPECIFIC TRANSACTION. IF YOU DO NOT UNDERSTAND THIS FORM OR FEEL THAT IT DOES NOT PROVIDE FOR YOUR LEGAL NEEDS, YOU SHOULD CONSULT A NORTH CAROLINA REAL ESTATE ATTORNEY BEFORE YOU SIGN IT.

This offer shall become a binding contract on the Effective Date.

Date: _____

Buyer *Marcus S Hall*  dotloop verified 06/12/14 3:02PM EDT LGG5-VJE6-3GVR-TAVR  (SEAL)

Date: _____

Buyer _____ (SEAL)

Date: _____

Buyer *Alisa M Hall*  dotloop verified 06/12/14 3:00PM EDT BT57-OQKD-YG24-5CJF  (SEAL)

Date: _____

Seller *Paul Baggett*  dotloop verified 06/23/14 2:19PM EDT FN4G-PSAE-2SGR-48OH  (SEAL)

Date: _____

Seller _____ (SEAL)

Business Entity Seller:

Date: _____

_____
(Print Entity Name)

By: _____
(Signature)

Title: _____

STANDARD FORM 800-T
Revised 7/2013
© 7/2013

Case 5:21-cv-00096-BO   Document 1-3   Filed 02/25/21   Page 27 of 55

dotloop signature verification: www.dotloop.com/my/verification/DL-65678365-7-3DU

## NOTICE INFORMATION

**NOTE**: INSERT THE ADDRESS AND/OR ELECTRONIC DELIVERY ADDRESS EACH PARTY AND AGENT APPROVES FOR THE RECEIPT OF ANY NOTICE CONTEMPLATED BY THIS CONTRACT. INSERT "N/A" FOR ANY WHICH ARE NOT APPROVED.

**BUYER NOTICE ADDRESS:**

Mailing Address: _____

Buyer Fax#: _____
Buyer E-mail: _____

**SELLING AGENT NOTICE ADDRESS:**

Firm Name: _____
Acting as ☐ Buyer's Agent ☐ Seller's (sub)Agent ☐ Dual Agent
Mailing Address: _____
_____
Individual Selling Agent: _____
☐ Acting as a Designated Dual Agent (check only if applicable)
License #: _____
Selling Agent Phone#: _____
Selling Agent Fax#: _____
Selling Agent E-mail: _____

**SELLER NOTICE ADDRESS:**

Mailing Address: _____

Seller Fax#: _____
Seller E-mail: _____

**LISTING AGENT NOTICE ADDRESS:**

Firm Name: _____
Acting as ☐ Seller's Agent ☐ Dual Agent
Mailing Address: _____
_____
Individual Listing Agent: _____
☐ Acting as a Designated Dual Agent (check only if applicable)
License #: _____
Listing Agent Phone#: _____
Listing Agent fax#: _____
Listing Agent E-mail: _____

## ESCROW AGENT ACKNOWLEDGMENT of INITIAL EARNEST MONEY DEPOSIT

Property: _____

Seller: Allure Homes, LLC _____

Buyer: Marcus & AlisaHall _____

**Escrow Agent acknowledges receipt of the Initial Earnest Money Deposit and agrees to hold and disburse the same in accordance with the terms hereof.**

Date _____          Firm: _____

                                      By: _____
                                          (Signature)

**STANDARD FORM 800-T**
**Revised 7/2013**
**© 7/2013**

EXHIBIT
*tabbies*
B



Allure
Homes
subtle charm

1124 Gunnison Place
Raleigh, NC 27609
Phone: 919-696-8500
Fax: 919-645-9552
www.allurehomesnc.com

# Plan Specifications

**Buyer:**　　　**Marcus & Alisa Hall**

**Address:**　　**4913 Yadkin Road**

**Plan Designer:**　　**David Kenoyer – KDK Designs**

**Plan Description:**

| Heated | 1st Floor | 2421 |
|--------|-----------|------|
|        | 2nd Floor | 1083 |
|        | Basement  | 1307 |
|        | Total     | 4811 |
| Other  | Garages   | 871  |
|        | Porches   | 789  |
|        | Basement  | 807  |
| Total  |           | 7278 |
|        |           |      |

- o 2 Story
- o 3 car Garage
- o 5 Bedroom
- o 4.5 Baths

**Site Work/Grading & Clearing**
- o Homeowner and Builder to agree upon clearing limits.  After initial clearing the request and removal of additional trees will be at the expense of the buyer.
- o Final grade lot prior to landscaping

Page **1** of **10**

Homeowner Initial _____

Contractor Initial _____



**Allure Homes**
subtle charm

1124 Gunnison Place
Raleigh, NC 27609
Phone: 919-696-8500
Fax: 919-645-9552
www.allurehomesnc.com

## Concrete Drives & Walkways – Circle Driveway per Plot Plan

- o Basic Concrete - 4" thick, 3000 psi
- o Trawled Expansion Joints
- o Colored or stamped concrete and /or accents can be priced
- o Single Car Garage Entry to Patio Area – Broom Finished Concrete – ~4' wide
- o Driveway to Garage: Broom Finished Concrete
- o Front Walk: Broom Finished Concrete
- o Circle Driveway: Broom Finished Concrete

## Footings

- o Foundation to be poured wall basement per plans
- o Footing excavation will be to bearing soil or as required by soil engineer
- o Excessive footing costs: In the rare event that existing soil conditions require additional excavation beyond a maximum average depth of 2' from the existing grade to the top of the footing, builder will notify buyer as condition is discovered and buyer shall pay additional labor and material expenses in accordance with change order procedure.
- o Non-standard footing excavations such as rock or underground springs shall be billed at an additional cost to the buyer.
- o Footings will be 3000 psi concrete.

## Framing

- o The house will be framed per engineered plans using conventional methods.
- o All wood species, sizes and means of fastening will be provided and installed per codes and engineered plans.
- o Any wood members that are warped, weathered or otherwise judged to have lost structural integrity will be discarded at the discretion of builder
- o Wood members will go through a process of drying out which may result in warping or "crowning" after installation. This is natural and these members will be discarded only if interfering with wall coverings.
- o Floor sheathing to be ¾" AdvanTech® or equal. Sheathing to be glued and screwed to floor joist to maximize floor integrity
- o Wall sheathing to be 7/16" OSB covered in house wrap
- o Roof sheathing to be 7/16" OSB covered in #15 felt paper
- o First floor – Floor system to be i-joists from Boise Cascade

Page **2** of **10**

Homeowner Initial _____

Contractor Initial _____



**Allure Homes**
subtle charm

1124 Gunnison Place
Raleigh, NC 27609
Phone: 919-696-8500
Fax: 919-645-9552
www.allurehomesnc.com

**Porch & Garage Flatwork Finish**
- All concrete slabs to be a minimum of 4" thick and 3000 psi concrete
- Hairline cracks do appear in large span slab pours and are not considered a structural defect
- Garage:  Smooth finished, standard concrete
- Lower Porch – Irregular Pennsylvania Flagstone
- Front Porch & Steps – Irregular Pennsylvania Flagstone
- Garage Steps - Masonry w/Flagstone treads
- Driveways – Street to garage and circle driveway - Driveway is broom finished with trawled joints

**Foundation/Masonry**
- Poured Concrete Basement Foundation
- Foundation/Veneer Brick Type/Color – Oversized/TBD - **$350/k allowance**
- Joint Type – Flush Joint
- Brick all sides – Yes
- Mortar Color – Grey
- Sealed/Conditioned Crawl – N/A
- Waterproofed and backfilled per code with drains
- Interior garage foundation – Brick
- Foundation height will be determined by code, Allure Homes & natural grade of lot.  Allure Homes will exercise every effort to minimize the number of steps into your home. However, code & natural lot grade are the final determining factors.
- Garage Steps – Brick w/stone treads

**Exterior General**
- Gutters – Yes – 5" K-Style - Downspout drainage to edge of beds
- Shutters – Vinyl with hinges and shutter hold backs
- Architectural Shingles  - 30 year product - Color TBD
- Fiber Cement Siding – 6 ¼" w/5" exposure
- Fascia & Frieze boards to be **Miratec Specific**…..
- Front & Rear & Lower Porch Ceilings: 1x6 T&G Pine – Can be painted or stained
- Rear Porch Flooring Material – T&G Thermo-Treated Ash – Sanding and finish is optional ($1850 – will wait to see what floor looks like installed)

Page **3** of **10**

Homeowner Initial _____

Contractor Initial _____



**Allure Homes**

subtle charm

1124 Gunnison Place
Raleigh, NC 27609
Phone: 919-696-8500
Fax: 919-645-9552
www.allurehomesnc.com

### Exterior Doors

- Front Entry – Per plans – Stain Grade Mahogany
- Mudroom Entry – Per plans - Stain Grade Mahogany
- Garage Service Door – Fiberglass 2-Panel
- Sitting Porch Door – Fiberglass - 8/0 Double Full Glass
- Garage Door – 1-18x8 & 1-9x8 Cloplay Gallery Model GD5SV – Long Carriage Panel, Long Glass with Grilles and Decorative Hardware - Custom Overhead Door is our vendor

### Windows

- Ply-Gem Pro Series 200 Double Hung, Lo-E, Argon Gas Filled wood windows w/PVC no-rot exterior sill and brick-mould – SDL Grills Pattern per plans
- No Screens

### Interior General

- 10' Ceilings 1st Floor
- 9' Ceilings 2nd Floor
- Choice of 7 Sherwin Williams Flat Latex Paint Colors
- Any other brand and/or finish can be priced
- Door Casing – FJ-445
- Window Casing – FJ-445
- Base board - 7 ¼" MDF – 1st & 2nd Floor
- Interior Hardware – Finish TBD
- Crown Moulding - 1 pc. 5 ¼" Cove Profile Downstairs & Upstairs
- Built in cabinets – Family room to each side of fireplace, Mudroom – Built on-site by interior trim carpenter
- 1x6 Pine on one wall in stair well – one story
- Closets – Custom shelving.  Mix of MDF and Finger Jointed Wood.  Included is standard linear hanging in all closets, one sweater box per secondary closet & two sweater boxes per master closet.  Final layout to be determined after drywall.
- Drywall – ½" on heated walls & ceilings – 5/8" Type "X" on garage ceiling
- Garage Base Board – 7 ¼" MDF
- Garage Window & Door Casing – FJ-445
- Interior stairs – Reclaimed Pine Tobacco Barn Floor Treads, painted pine risers, 6310 oak handrail, 2x2 painted balusters, 5" painted newel posts.  Vision Stairway is our vendor

Page **4** of **10**

Homeowner Initial _____

Contractor Initial _____



**Allure Homes**
subtle charm

1124 Gunnison Place
Raleigh, NC 27609
Phone: 919-696-8500
Fax: 919-645-9552
www.allurehomesnc.com

## Interior Doors/Hardware - $3,500 Hardware Allowance – Includes interior & exterior door hardware

- o 1st floor – Masonite Solid Core, Smooth Face 8' – Style TBD by Buyer
- o 2nd floor – Masonite Solid Core, Smooth Face 6'8" – Style TBD by Buyer
- o Barn doors downstairs are included -
- o Emtek hardware or similar
- o Guy C. Lee or Stock Building Supply is our vendor for doors

## Paint

- o Choice of 7 Sherwin Williams flat latex interior wall colors
- o Ceilings are flat white
- o Choice of up to 2 Sherwin Williams exterior colors – siding to be flat and trim to be semi-gloss
- o Additional colors will be $350 per room
- o One trim color for entire house
- o Latex semi-gloss for trim
- o Latex flat for all wall and ceiling surfaces
- o Any other finish will include additional costs

## Ceramic Tile – Already given $1,200 credit to offset upgraded porch ceilings

- o Field Tile - $6.50/sqft. – Straight run
- o Bull Nose - $5.00/lnft.
- o Backsplash - $6.00/sqft. – Includes back wall only. Not side walls under upper cabinets
- o Niches – Master shower & Down shower – 1 each. Additional $200 each
- o Soap Shelf – 1 each Upstairs secondary baths – Additional $75 each
- o Accents - $1500 allowance total house
- o Master shower ceiling – yes
- o Tub wall heights – 7' above finished flooring
- o Locations – Master Bath, Upstairs Secondary Baths, Basement Bath, Kitchen Backsplash & Rec Room Backsplash

## Hardwoods

- o Species – Reclaimed Pine Tobacco Barn Flooring – Random Width Layout – Skip Planed
- o Finish – 3 coats polyurethane
- o Vents – Metal Surface Mount
- o Stairs – Matching hardwood treads & painted pine risers

Homeowner Initial _____

Contractor Initial _____

Case 5:21-cv-00096-BO   Document 1-3   Filed 02/25/21   Page 33 of 55



**Allure Homes**
subtle charm

1124 Gunnison Place
Raleigh, NC 27609
Phone: 919-696-8500
Fax: 919-645-9552
www.allurehomesnc.com

- Locations – All heated first floor (except master bedroom, master bath and master closet), upstairs foyer/hallway area. Rec Room, Play room and Downstairs Stair Foyer Area.

**Carpet**
- $19/sqyd allowance installed including pad
- Includes pad
- Locations – Master Bedroom & Closet, Upstairs Bedrooms, Basement Bedroom

**Cabinets – $30,000 Allowance**
- Areas included – Kitchen, Laundry, all bath areas, Rec Room
- Need clarification on what's wanted in Computer

**Countertops - $12,500 Allowance**
- Level 1 granite in Kitchen
- Remnants in all bath areas
- Remnant in laundry

**Plumbing - $14,266.87 fixture allowance – Includes all faucets, sinks, disposal, toilets & shower/tub fixtures selected by owners**
- Plumbed Per Code
- 2 Tankless Gas Water Heaters w/recirculation pump
- 3 Exterior Hose Bibs – 1 Hot & Cold Mixer
- Bath hardware - **$1000 Allowance Installed**
- Shower Doors – 3/8" Frameless Glass - Down bathroom, bath 3 and Master bathroom - **$900 allowance each**

**HVAC/Energy Efficiency**
- 15 Seer Gas Furnace 1st Floor
- 15 Seer High Efficiency Heat Pump 2nd Floor
- 15 Seer High Efficiency Heat Pump Basement
- Duct type – external insulated
- Thermostat – digital programmable
- Bath fans – standard by code in all bath areas
- Brand – Trane
- Gas Line Locations – kitchen, family room fireplace (gas log starter), tankless water heater, porch fireplace, downstairs grill, kitchen range, porch fire place gas log starter
- Hood Vent Ducting - Yes

Homeowner Initial _____

Contractor Initial _____



**Allure Homes**
subtle charm

1124 Gunnison Place
Raleigh, NC 27609
Phone: 919-696-8500
Fax: 919-645-9552
www.allurehomesnc.com

- o Certified – Live Green Certified
- o Insulation Per Code
- o INSULATION TO BE INCLUDED BETWEEN BASEMENT AND FIRST FLOOR
- o INSULATION TO BE INCLUDED IO MASTER BEDROOM INTERIOR WALLS
- o TechShield® Radiant Barrier Roof Sheathing

**Appliances - $32,500 allowance**
- o Includes – Cooktop or Range, Oven, Microwave, Hood Vent, Dishwasher
- o Refrigerators are not included
- o Washers & dryers are not included

**Electrical - $9,000 fixture allowance – Includes all mounted light fixtures, fans, cabinet lighting & doorbell. 5 dimmers are included. They can be installed at a price of $30 per location**
- o House wired per code
- o 400 amp service
- o 2 floodlights – Buyer to choose locations
- o 60 recessed cans – Additional recessed cans over allowance are $100 each
- o Light switch type – Toggle
- o Switched receptacles – One per bedroom – Total of 5
- o Floor outlets – 2 in Family room
- o Fluorescent lights in closets
- o Loops for future use to be priced as additional
- o Generator Panel – to be priced as additional

**Structured Wiring/Music/Security/Phone/Cable - $10,000 allowance**
- o 42" Structured Wire Can – location TBD
- o Phone Module – 1
- o Video Module – 1
- o Multimedia Runs – 4
- o Surround Sound Prewire – Rec Room
- o Whole House Audio Prewire – 4 Rooms
- o Security System Pre-wire
- o No audio equipment is included
- o Whole house audio system (equipment) can be priced

Page **7** of **10**

Homeowner Initial _____

Contractor Initial _____



**Allure Homes**
subtle charm

1124 Gunnison Place
Raleigh, NC 27609
Phone: 919-696-8500
Fax: 919-645-9552
www.allurehomesnc.com

**Mailbox:** Rodney's Sign Company Style #3206

**Other Allowances**
- o $2,000 – Mirrors – Plate Glass is Standard
- o $20,000 – Landscape allowance

# Disclaimers

1. Any finish other than flat paint on walls and semi-gloss paint on trim work will not be warranted.
2. Builder reserves the right to change brands and materials as needed without notice.
3. Any/all doors are only warranted by the manufacturer (a copy of the manufacturer's warranty can be provided per request). Allure Homes is not responsible for the installation or refinishing of any doors replaced as a result of a manufacturer's defect.
4. For safety reasons, homeowners will not be permitted to visit the job site unless accompanied by the project manager. Site visits are by appointment only and subject to project manager's availability (builder reserves the right to limit onsite homeowner visits).
5. All walk-throughs (electrical, mechanical, plumbing, AV, interior trim, etc) must be scheduled to start between the hours of 8am and 3pm Monday through Friday.
6. The homeowner is not permitted to make construction scheduling decisions.
7. Any/all clarifications OR changes to contract must be submitted to the Allure Homes' office for review, approval, and execution.
8. Any/all instructions for subcontractors must come directly from an Allure Homes representative.
9. Included in your sales price is an estimated 30-40 hours of time to consult with a professional designer to review the following areas:
   a. **Interior Specifications:**
      i. Paint colors/finishes
      ii. Cabinetry/millwork
         1. - Style
         2. - Color/finish
         3. - Hardware
      iii. Countertops
      iv. Tile
      v. Flooring
         1. - Carpet
         2. - Hardwood

Page 8 of **10**

Homeowner Initial _____

Contractor Initial _____



        3. - Tile
- vi. Fixtures
  1. - Electrical
  2. - Plumbing
- vii. Appliances
- viii. Bath accessories
- b. **Exterior Specifications:**
  - i. Paint colors
  - ii. Brick/stone selection
  - iii. Roof
    1. Shingle color
    2. Standing seam color
  - iv. Windows (if applicable)
  - v. Doors (if applicable) - Hardware
- c. **Other Services:**
  - i. Initial meeting with each client prior to construction
  - ii. Furniture layout
  - iii. Electrical plan
  - iv. Electrical walkthrough
  - v. Periodic site visits

10. Tile & Stone:
   a. **Natural Stone:** Marbles, travertine, limestone and slates are susceptible to pits, veins, cracks, and color variations. Allure Homes cannot guarantee these features will not be present in these products if installed in the home.
   b. **Porcelain & Ceramic Tiles:** These products are created using raw materials, and many are produced to look like natural stone with a great range of color and less repeated patterns. These products do have dye lots which vary from lot to lot. Enough material will be ordered to cover the specified tile areas, but in the event of field changes that would require more material to be ordered, there could be variations in product.
   c. **Handcrafted Tiles:** These products will have variations in size, thickness and color. Some have a crackle finish which may require sealing. These products are made to be imperfect to create a unique look. For this reason, Allure Homes will not guarantee a uniform look when installing this product.
   d. **Grout:** Any stain-resistant grouts are material upgrades and may require additional labor which will also be considered an upgrade (not included in tile allowances)

Page **9** of **10**          Homeowner Initial _____

                                              Contractor Initial _____



**Allure Homes**
subtle charm

1124 Gunnison Place
Raleigh, NC 27609
Phone: 919-696-8500
Fax: 919-645-9552
www.allurehomesnc.com

    e.  **Inspection of Material:** Inspection of material is required. Installation of material constitutes acceptance.

    f.  **Returns:** Returns are accepted in full, unopened cartons (unless sold by the piece or square foot). Re-stocking fess will be applied if a full order of in-stock material is returned. Closeout or special order material cannot be returned.

    g.  **Allowances:** All allowances are the Builder's estimates for any particular feature of the home and are set to be a starting point for pricing to the homeowner. For any particular feature of the home that has a specified allowance amount, the homeowner has that allowance amount to spend on that particular feature of the home. After pricing for the feature from the Builder's vendor(s) is obtained, any significant variance between the allowance amount and the homeowner pricing will be addressed (significance of variance to be determined by the Builder). A credit is due to the homeowner if the pricing is significantly less than the allowance, OR the homeowner will be responsible for the pricing overage if the pricing significantly exceeds the allowance. _**Credits and/or overages will be documented on a change order. Credits will be applied against the total Sales Price for the home, and payment for overage amounts is due upon homeowner acceptance of the feature and its overage price.**_

    h.  **Handrails:** Handrails only provided per code unless otherwise specified in plans and/or job specs

**Sales Price - $1,041,000**

Signed: _____ Date: _____
      (Builder)

Signed: _____ Date: _____
      (Buyer)

Signed: _____ Date: _____
      (Buyer)

**Homeowner Initial** _____

**Contractor Initial** _____

Case 5:21-cv-00096-BO   Document 1-3   Filed 02/25/21   Page 38 of 55

EXHIBIT

C

## CHRONOLOGY OF MOLD DISCOVERY AND REMEDIATION

**6/23/14**      **See <u>Offer to Purchase and Contract – New Construction</u>.**

Executed by Marcus and Alisa on 6/12/14 and Paul Baggett on behalf of Allure Homes, LLC on 6/23/14.  Purchase price of $1,041,000.

Section 3(a): Quality of Construction requires that the Seller construct the home (1) in accordance with all specifications and plans, (2) in compliance with all laws, regulations, codes, and ordinances, and (3) in a good and workmanlike manner.

**See <u>SIGNED Plan Specifications</u> and <u>Final Schematics from Architect</u>.**

Allure Homes, LLC subcontracted with Carolina Comfort Air for HVAC work. There are no schematics for how the HVAC system will be installed.

There are three air handling units. In the Lower Level there is a 1.5 ton unit serving the Lower Level and a 3 ton unit serving the First Floor. In the high attic there is a 1.5 ton unit serving the Second Floor. All three units are manufactured by Trane. They each have an attached supply air distribution box that is internally lined with fiberglass insulation attached to the unit.

Flex duct runs from the air handling units to individual room or area grilles. The First Floor unit has a secondary distribution box that is internally lined. The Second Floor unit has an outdoor air inlet flex duct attached to the return side of the air handler.

The air handling components that exhaust air from the house include exhaust fans in each of the four full bathrooms, a clothes dryer vent, two fireplaces and a commercial grade range hood in the kitchen.

The kitchen package was assembled by Kitchen & Bath Galleries ("Kitchen & Bath").  Marcus and Alisa worked with the owner of Kitchen & Bath to make the selections.  The range hood was selected to service the large Wolf range.  It was included in the contract with Allure homes for the construction of the home. Kitchen & Bath delivered the package to the home.  Upon information and belief, the range hood was installed by Carolina Comfort and Air as HVAC subcontractor to Allure Homes.

**4/2/15**      **See <u>HUD-1</u>.**

Settlement Statement signed by all parties.

**4/4/15**      Alisa and Marcus move into 4913 Yadkin Drive with their three children Addison, Ainsley, and Brayden.  Alisa was 33 years old.  Addison was 6 years old; Ainsley was 4 years old; and Brayden was 2 years old.

Before this, Alisa and the children had no significant medical history.

1

The master bedroom occupied by Alisa and Marcus was on the first floor. The bedrooms occupied by the children were on the second floor of the home. Alisa was not employed outside the home and spent more time in the home than any other family member.

Marcus rose earlier than the rest of the family and would run the range hood each morning for up to two hours, to prevent smells from the kitchen making their way to the master bedroom where Alisa was still asleep.

| | |
|---|---|
| 12/1/16 | **See <u>Newcomb Maintenance Records</u>.** |
| | Newcomb performs bi-annual maintenance. No abnormalities noted. |
| 12/19/17 | **See <u>Newcomb Maintenance Records</u>.** |
| | Newcomb performs bi-annual maintenance. No abnormalities noted. |
| 6/25/18 | **See <u>Newcomb Maintenance Records</u>.** |
| | Newcomb performs bi-annual maintenance. Noted that everything was running properly. |
| 8/28/18 | **See <u>Newcomb Maintenance Records</u>.** |
| | Newcomb service call due to musty smell. Fresh air damper found open. Manually closed. Recommended to replace damper motor. |
| 9/27/18 | **See <u>Newcomb Maintenance Records</u>.** |
| | Newcomb service call. Replaced bad damper motor. |
| 10/8/18 | **See <u>10/8/18 Home Air Check Indoor Air Quality Report</u>.** |
| | Marcus collected samples himself from basement, kid's hallway, and family room. This was done after Dr. Frances Meredith sent Alisa for labwork to test for mycotoxins upon suspicion of mold. All home-testing reports came back as either elevated or severe. |
| 10/28/18 | **The Hall family moves out of 4913 Yadkin Drive and in with the parents of Marcus Hall.** |
| 10/29/18 | **See <u>10/29/18 Mold Spore Trap Report for Testing by Healthy Home Restoration</u>.** |
| | Samples taken from outside, the finished basement, and the living room. Outside: Aspergillus/Penicillium at 27 spores per cubic meter. Basement: Aspergillus/Penicillium at 107 spores per cubic meter. Living Room: Aspergillus/Penicillium at 360 spores per cubic meter. |

2

| 10/30/18 | See <u>Curriculum Vitae for Bob Herrick</u>. |
|---|---|

Marcus and Alisa hired Bob Herrick ("Mr. Herrick"), an environmental engineer, to investigate mold.

| 11/4/18 | Mr. Herrick collects 3 spore trap mold-in-air samples: center bedroom upstairs, west attic, and outdoor for reference. |
|---|---|

Mr. Herrick meets with Mark Roberts of MARS Heating and Air of Sanford, NC. Mr. Roberts established MARS in 2002. He holds a Mechanical H-3-1 License with the State of North Carolina (#24251) and an Associate Degree in Applied Science for Heating, Ventilation, and Air Conditioning.

Mr. Roberts disconnected one of the branch supply flex hoses in the attic and noted a heavy presence of mold on the surface of the insulation liner of the unit. He suspected that the air velocity in the unit was high enough to strip water droplets off the coil. These droplets were captured on the fiberglass insulation lining the supply distribution box.

See <u>11/6/18 Mold Spore Trap Report of Mr. Herrick's Testing Prepared by Eurofins</u>.

Outdoor spore count of 238 for Aspergillus/Penicillium. Center Bedroom spore count of 8125 for Aspergillus/Penicillium. West attic spore count of 613 for Aspergillus/Penicillium.

| 11/15/18 | HVAC systems turned off. |
|---|---|

| 11/17/18 | Mark Roberts of MARS Heating and Air met Marcus and Mr. Herrick at the home. All three air handling units found to have heavy presence of mold on the surface of the insulation inside the supply duct, after the coil. |
|---|---|

| 11/18/18 | Recommendation from Mr. Herrick to (1) obtain specifications for HVAC system, and (2) take HVAC units out of service until they can be modified to be in conformity with acceptable standards. |
|---|---|

| 11/20/18 | See <u>11/20/18 Mold Bulk Report prepared by Eurofins (I18-3667)</u>. |
|---|---|

Mold growth ratings as follows: Basement (4 for fungal mycelial fragments); Second Floor 2a (5 for Aspergillus/Penicillium and 3 for fungal mycelial fragments); and Second Floor 2b (3 for Aspergillus/Penicillium and 2 for fungal mycelial fragments).

| 11/27/18 | Mr. Herrick collected spore trap air sample in a candidate furnished rental home at 200 Penley Circle in Raleigh, NC. This sample showed an absence of both *Aspergillus/Penicillium* and *Cladosporium*. |
|---|---|

3

| | |
|---|---|
| 11/30/18 | **See <u>Curriculum Vitae of Frank Tyndall</u>.** |
| | EGH retained Frank Tyndall to provide expert services to EGH and to the Halls in the field of mechanical engineering. |
| 12/1/18 | **See <u>200 Penley Circle Lease</u>.** |
| | Lease commences for 200 Penley Circle in Raleigh, NC. Rent is $3,045 per month. Marcus and Alisa are responsible for all utilities. The Hall family moved into this location. |
| 12/7/18 | **See <u>12/7/18 Surface Sample Log</u>.** |
| | Mr. Herrick collects samples by tape lift from the basement, first floor, and second floor. |
| 12/8/18 | **See <u>12/8/18 Mold Bulk Report prepared by Eurofins (I18-3951B)</u>.** |
| | 7 of the 27 samples taken by Mr. Herrick result in a 0 mold growth rating; and 20 of the 27 samples resulted in a 1 mold growth rating. 0 indicates no fungal matter detected. 1 indicates trace amounts of fungal matter detected, probably due to settling, does not indicate active mold growth. |
| | The observations and the data suggest to Mr. Herrick that active mold growth in the house may be localized in the HVAC system air handlers and ductwork in the HVAC systems. |
| 1/5/19 | Mr. Herrick collects samples from each room with wall-to-wall carpeting by using a vacuum cleaner with a filter for takeup. |
| 1/9/19 | **See <u>1/9/19 Analytical Results prepared by EMSL Analytical (611900029)</u>.** |
| | EMRI Value of 15.5 and Level 4, which indicates High Relative Moldiness. |
| 2/1/19 | Mr. Herrick performs bump testing of the air handling units and takes measurements of the pressure differential between the house and outside. The pressure ranged from neutral to negative 4.5 Pascal (0.018 inches of water) as the several elements of the system were operated. |
| 4/19/19 | Cleanup and Restoration Plan developed by Mr. Herrick and Mr. Tyndall. Phases of the Cleanup and Restoration Plan include: |

1. Remove items from home
2. Clean Air ducts and install HVAC Equipment
3. Final Cleaning of interiors
4. Clearance Testing

4

Phase (2) includes:

Remove the mixing boxes on each floor having inside insulation and dispose of mold-contaminated insulation. Remove the air handling units on each floor and steam clean the condenser coils and connected metal ductwork.

Remove and replace the mold-contaminated flexible ductwork on the second floor and replace it with new flexible ductwork.

Professionally clean all runs of flexible ductwork serving the ground and first floors by starting at each air discharging point and brush vacuuming in the opposite direction of air flow to each mixing box connection.

Vacuum cleaning equipment is to be provided with HEPA filtering to trap mold spores and test to demonstrate successful removal of mold spores from cleaned air ducts.

Install two new humidification units on the first and second floor HVAC systems.

Install new UV light systems for treatment in each of the three air handler units.

Install a new air handler system to provide conditioned air in an amount necessary to balance cooktop ventilation exhaust and other previously installed exhaust fans.

| | |
|---|---|
| **5/3/19** | Mr. Herrick meets three representatives of Carolina Comfort Air at 4913 Yadkin to allow these individuals to perform a visual inspection of the HVAC systems. |
| **5/8/19** | Mr. Tyndall meets with representatives, counsel, and expert witnesses for Allure Homes to allow these individuals to perform a visual inspection of the HVAC systems. |

**See 5/9/19 Mold Bulk Report (Allure) and 5/9/19 Mold Spore Trap Report (Allure).**

Samples collected by Mr. Herrick. Bulk Report finds mold growth ratings of 4 or 5 in Attic – Supply side insulation, Basement – AHU Duct WAU at coil, and Basement – AHU Supply Side Insulation. Remaining areas have mold growth ratings of 0 – 2.

| | |
|---|---|
| **5/18/19 – 5/19/19** | Marcus and Mr. Herrick, with Alisa attending by telephone, sort and mark household furnishings and personal belongings for either disposal or cleaning and restoration. |
| **5/20/19** | White Glove Cleaning performs a pack-out of the contents of 4913 Yadkin Drive. |
| **5/21/19** | Mr. Tyndall meets with representatives and counsel for FCCI, who insures Carolina Comfort Air, performed a visual inspection of 4913 Yadkin Drive. |

5

| | |
|---|---|
| 5/28/19 | See **5/28/19 Brothers Cleaning Invoice**. |
| | Invoice for $1,646.74 for garment and textile cleaning and restoration. |
| 5/30/19 | Mr. Tyndall meets representatives of Allure Homes, Carolina Comfort Air, and Newcomb at 4913 Yadkin Drive for operation of the HVAC systems. |
| 6/29/19 | See **11/27/19 Invoice from Enpuricon** and **11/25/19 White Glove Cleaning Invoice**. |
| | Enpuricon removes attic ductwork and cleans the in-place ducts of the first and lower level. The cost of this work was $3,162.00. |
| | White Glove performs the pack-out of the home. The cost of this work was $2,591.16. |
| 7/18/19 | See **7/15/19 Weathermaster Work Order**. |
| | WeatherMaster meets Mr. Tyndall at 4913 Yadkin to perform the following: refurbish three Trane air handling systems, replace lined insulation distribution boxes with wrapped insulation, replace previously removed original flex ducts on the second floor with seven drops, and install UV lights in the three existing systems. Invoice for $4,952.00. |
| | See **WeatherMaster Recommendation**. |
| | Roger Richardson of WeatherMaster recommends changing all three units, because cleaning would be an extensive process that would not guarantee growth would not return. |
| 7/22/19 | Weathermaster Inc. conducts repairs to the three air handling units and selected ductwork. |
| 9/11/19 | Installation of three new HVAC units by WeatherMaster. Cost of $31,070.00. |
| 9/19/19 | See **9/19/19 Mold Spore Trap Report prepared by Eurofins**. |
| | Aspergillus/Penicillium spore count acceptable on all three levels. Only matter of concern is the higher level of Basidiospores (a marker for outdoor air) on the Second floor, which indicated that the attic air was likely being sucked into the second floor AHU. |
| | See also **9/2019 Monitor Basement of Yadkin** and **9/2019 Monitor Lower Level of Yadkin**. |
| | Both show VOCs steadily declining, which suggests no future jump is expected. |
| | See **Summary Table of Mold Spore Count (9/2019 – 10/2018)**. |

6

| | |
|---|---|
| 10/18/19 | See **10/18/19 Enpuricon Proposal for Remediation and Cleaning**. |

Remediation scope includes:

Contain each floor and place under negative pressure using HEPA filtered air scrubbers.
HEPA vacuum and clean all surfaces using an antimicrobial cleaning solution.
Run HEPA filtered air scrubbers in space to achieve 100 air exchanges

Cost of remediation and cleaning estimated at $19,710.00. Marcus and Alisa, in consultation with Mr. Herrick, opted not to move forward with this proposal and to instead test each floor individually.

| | |
|---|---|
| 11/1/19 | See **11/5/19 White Glove Cleaning Invoice**. |

White Glove cleans all contents inside 4913 Yadkin including items in cabinets, piano, TVs, pictures on walls, and exercise equipment. The cost of this work was $4,107.31.

| | |
|---|---|
| 11/11/19 | See **12/3/19 Invoice from Enpuricon**. |

Enpuricon installs isolation barriers in the stair well so that the house has three separate spaces to treat. They then perform a fine cleaning of the walls and floors of the second floor. The cost of this was $1,163.86.

| | |
|---|---|
| 11/14/19 | Mr. Herrick collects air samples from the basement and first floor. Mr. Herrick is unable to collect air samples from the second floor, because someone had set the thermostat to cool, which meant the unit had not operated for an indeterminate number of days. |

| | |
|---|---|
| 11/15/19 | See **11/15/19 Mold Spore Trap Report**. |

The results show that very low spore counts have been achieved on the basement and first floor levels.

| | |
|---|---|
| 12/1/19 | Marcus and Alisa extend their lease for 200 Penley Circle by six months. |

| | |
|---|---|
| 12/5/19 | See **Wind Rose Construction Invoice**. |

Wind Rose Construction installs weather stripping. The cost of this work was $200.00.

| | |
|---|---|
| 12/26/19 | See **2/3/20 Invoice from Enpuricon**. |

Enpuricon performs fine-cleaning of second floor of home. The cost of this was $4,628.35.

7

| | |
|---|---|
| 12/30/19 | **See 12/30/19 Mold Spore Trap Reports.** |
| | Samples collected by Mr. Herrick. Results indicate that all three floors of this house meet the IICRC definition of a Category I condition, which is the industry standard for determination of successful mold remediation. |
| | **Condition 1** (normal fungal ecology): an indoor environment that may have settled spores, fungal fragments or traces of actual growth whose identity, location, and quantity are reflective of a normal fungal ecology for a similar indoor environment. |
| 1/5/20 | **See 1/25/19 Receipt from J. Parker Builders.** |
| | J. Parker replaces the carpet in the home. The cost of this work was $1,568.00. |
| 1/6/20 | **See 1/6/20 Mold Spore Trap Report.** |
| | Samples collected by Mr. Herrick from the porch, master bedroom, upstairs bedroom, kitchen, and basement. All areas within normal range, except the basement. Outdoor air contained 13091 Basidiospores per cubic meter. Basement contained 15030 Basidiospores per cubic meter. |
| 1/10/20 | **See Invoice from Roman Bautista.** |
| | Roman Bautista Painting repaints the home. The cost of this work was $4,720.00. |
| 1/27/20 | North State Wood Products refinishes wood floors in Yadkin. The cost of this was $6,527.94. |
| 2/14/20 | **See 2/17/20 Mold Spore Trap Report.** |
| | Samples collected by Mr. Herrick. The three air samples collected before the range hood/supply air system was activated look like a fully satisfactory mold profile from a non-problem residence. Then the range/supply air system was activated for a half hour before retesting. The second lower level air sample showed elevated levels of *Aspergillus/Penicillium*. The source was believed to be the ice maker, and Mr. Herrick recommended a cleaning of the ice maker to achieve fully satisfactory air quality. |
| 2/18/20 | Mr. Herrick and Mr. Tyndall clean the ice machine. |
| 2/19/20 | **See 2/20/20 Mold Spore Trap Report.** |
| | Samples collected by Mr. Herrick. The lower level now exhibits an acceptable reading. |
| 3/3/20 | **See 3/4/20 Mold Spore Trap Report.** |
| | Samples collected by Mr. Herrick from outside and all three floors of the home. All indoors samples within the acceptable range. |

8

| | |
|---|---|
| 3/6/20 | **See 3/6/20 Mold Spore Trap Report.** |
| | Samples collected by Mr. Herrick of all three floors and outside. These results supported the determination that the house was now at IICRC Condition 1 status, which was the objective of mold remediation. |
| | The Institute of Inspection Cleaning Restoration Certification ("IICRC") defines Condition 1 status as: |
| | **Condition 1** (normal fungal ecology): an indoor environment that may have settled spores, fungal fragments or traces of actual growth whose identity, location and quantity are reflective of a normal fungal ecology for a similar indoor environment. |
| 6/8/20 | **See 6/9/20 Mold Spore Trap Report.** |
| | Samples collected by Mr. Herrick of seven areas within the three floors of the home and the outdoors. All counts were within the acceptable range, with the exception of the area at entry to the range hood in the kitchen. This area saw a slightly elevated Basidiospore count compared to all other areas. |
| 6/11/20 | **See 6/11/20 Mold Spore Trap Report.** |
| | Samples collected by Mr. Herrick of makeup air at the range hood indicated elevated Basidiospore counts and thus what the 6/9/20 Results were attributable to. This was believed to be anomaly on test results. |
| 6/15/20 | **See 6/15/20 Mold Spore Trap Report.** |
| | Test results considered acceptable. |
| 7/1/20 | The Halls move back in to 4913 Yadkin Drive. |

9





EVERETT GASKINS HANCOCK LLP
Attorneys and Counselors at Law

E.D. Gaskins, Jr.
ed@eghlaw.com

Katie King
katie@eghlaw.com

August 19, 2020

*SENT VIA E-MAIL*

John T. Benjamin, Jr., Esq.
The Law Office of John T. Benjamin, Jr., P.A.
1115 Hillsborough Street
Raleigh, N.C. 27603
Benjamin@lawjtb.com
Counsel for Allure Homes, LLC

Lamar Armstrong, Jr., Esq.
The Armstrong Law Firm, P.A.
602 South Third Street (POB 27)
Smithfield, NC 27577
lamar@armstronglawyers.com
Counsel for Carolina Comfort Air, Inc.

Jim Roberts, Esq.
Lewis & Roberts, PLLC
3700 Glenwood Avenue, Suite 410
Raleigh, NC 27612
jar@lewis-roberts.com
Counsel for Newcomb and Company

    Re:    **Our Clients:**    **Marcus and Alisa Hall**
            **Residence:**    **4913 Yadkin Drive**
                      **Raleigh, North Carolina**

Dear John, Lamar, and Jim:

    As you know, our firm represents Marcus and Alisa Hall. In June of 2014, Marcus and Alisa contracted with Allure Homes, LLC ["Allure"] for the construction of a new home at 4913 Yadkin Drive in Raleigh, North Carolina. Allure then sub-contracted with Carolina Comfort Air, LLC ["CCA"] for design and installation of the HVAC systems. Newcomb and

The Historic Briggs Hardware Building • 220 Fayetteville Street • Raleigh North Carolina 27601
P. O. Box 911 • Raleigh, North Carolina 27602
Telephone: 919-755-0025 • Facsimile: 919-755-0009 • Website: www.eghlaw.com

Case 5:21-cv-00096-BO   Document 1-3   Filed 02/25/21   Page 48 of 55

Company ("Newcomb") performed bi-annual maintenance on the HVAC systems after Marcus and Alisa moved in.

Mold growth due to design flaws in the HVAC systems has caused Marcus and Alisa to incur extensive costs of remediation and caused Alisa to suffer what may now be permanent cognitive dysfunction. We believe the facts as outlined herein reflect that the negligence and breaches of contract by each of your clients have combined to cause physical harm to Alisa and significant financial loss to Marcus and Alisa.

### Statement of Facts

Marcus and Alisa and their three children aged two, four and six years old moved into 4913 Yadkin Drive in April of 2015. Alisa was thirty-three years old at the time. She was not then employed outside the home and thus spent more time in the home than any other member of the family.

Within three months of moving in, Alisa began to experience symptoms of fatigue, insomnia, weight gain, and impaired memory and concentration. In September of 2015, Alisa began a three year journey of medical appointment followed by medical appointment as doctors struggled to diagnose her ever-worsening symptoms. Alisa received referrals to endocrinologists, cardiologists, oncologists, neurologists, and psychologists. A timeline of Alisa's medical treatment is provided herein.

Finally in October of 2018, an integrative medicine specialist began to suspect mold toxins as the cause of Alisa's symptoms and referred Alisa for mycotoxin testing. Lab results showed Alisa had 6.43 ng of Ochratoxin A per gram of creatine in her urine. The common range for positive results is 1.2 – 5 ng/g. Ochratoxin A is the toxin produced by Aspergillus/Penicillium mold. Please see www.globalindoorhealthnetwork.com/ochratoxin and https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3255309/ for articles on Ochratoxin and its adverse health effects.

Following these positive test results, Marcus and Alisa retained environmental engineer Bob Herrick to test their home for mold. Mr. Herrick obtained test results in November of 2018 that showed 8,000 Aspergillus/Penicillium spores per cubic meter in the second floor East Bedroom; 6,603 Aspergillus/Penicillium spores per cubic meter in the second floor Southwest Bedroom; and 2920 Aspergillus/Penicillium spores per cubic meter in the first floor kitchen and living room. The outdoor spore count was 238 Aspergillus/Penicillium spores per cubic meter. The indoor spore counts compared with the outdoor spore count confirmed the presence of significant, actively growing Aspergillus/Penicillium mold in the Hall family's home.

At the recommendation of Alisa's medical providers, Marcus and Alisa and the children moved out of 4913 Yadkin Drive and began to lease a townhouse at 200 Penley Circle in Raleigh on December 1, 2018. Marcus and Alisa continuously rented 200 Penley Circle through June 30, 2020, while they attempted to have 4913 Yadkin Drive remediated. Mechanical Engineer Frank Tyndall worked with Mr. Herrick to identify the source of the active mold growth and to develop a plan for remediation, after they had determined the cause of mold growth in the newly constructed home. The cause is discussed in greater

2

detail below but was primarily a failure to correctly design a make-up air system, which failure resulted in creating negative air pressure in the home. Negative air pressure sucks moist outside air into the home, in this case, in quantities that the HVAC systems could not handle. The diagnosis and remediation of this problem occurred in phases and is outlined in the House Chronology provided herein. Remediation began in May of 2019 and has continued to date. In July 2020, clearance testing showed the mold spore counts in the home are now at acceptable and safe levels for Alisa, and the Hall family has now moved back into the home.

In March of 2019, Alisa had also tested positive for Lyme Disease. Unfortunately for Alisa, mold toxicity and Lyme disease often coexist as both impact the immune system and can cause chronic fatigue and adverse neurological symptoms, as happened to Alisa. See "Four Lyme Experts Share About Mold, a Common Lyme Disease Co-Condition" located at https://www.prohealth.com/library/four-lyme-experts-share-about-mold-a-common-lyme-disease-co-condition-47906#:~:text=One%20of%20the%20least%20recognized,at%20home%20or%20at%20work. This also helps explain why Alisa has been more significantly impacted by exposure to mold than any other member of her family.

Alisa treated with Dr. Sonia Rapaport of Haven Medical, as well as numerous others. Dr. Rapaport specializes in treatment of patients with biotoxin exposure and Lyme disease with chronic fatigue resulting from chronic inflammatory response syndrome (CIRS). Alisa still struggles with fatigue and neurocognitive dysfunction. The permanency of her condition is not yet known.

### Claim Against Carolina Comfort Air

The source of the mold growing in the Hall family's home was the HVAC systems, particularly the system serving the second floor. There are three heating/cooling systems serving the home. The air handling units serving the first floor and basement are located in the basement. The air handling unit serving the second floor where the children's bedrooms are located is in the attic. As explained below, the failure to compensate for the high-volume kitchen exhaust fan and to test the home for pressure balance resulted in negative pressure in the Hall family's home relative to the outside. The negative air pressure drew large quantities of moist, unconditioned air into the home, particularly into the attic air handling unit. Unconditioned humid outside air caused condensation on cooler surfaces in the mixing boxes and distribution centers that promoted mold growth, particularly in the attic unit. Moist, unconditioned outside air was drawn into the home as a result of negative pressure and mold spores from the active mold growing in the attic unit were circulated throughout the home during the operation of the HVAC systems and led to active mold growth in the mixing boxes and distribution boxes of the two air handling units located in the basement as well.

The most significant factor creating the negative pressure in the Hall family's home was the kitchen exhaust hood system. To ensure a properly balanced home (as opposed to one with negative pressure), the 2012 North Carolina Mechanical Code (Section 505.2) requires makeup air at a rate approximately equal to the volume of air being exhausted

3

from the home, including the kitchen exhaust system (typically 400 CFM). However, the Hall family's home vent hood exhausted air at a much higher rate than 400 CFM. The Allure contract calls for a hood vent (see Plan Specifications, Appliances), but does not indicate type or capacity. The hood installed in the Hall family's home is a Vent-A-Hood system which exhausts 1200 CFM when fully engaged. The volume of makeup air required by code to balance the HVAC systems in the Hall family's home, including the kitchen vent hood, was not provided.

Carolina Comfort Air ("CCA") was the HVAC subcontractor to Allure for the Hall family's home. CCA ordered and installed the Vent-A-Hood exhaust system as well as the three Trane HVAC heating/cooling systems serving the home. Thus the negative air pressure created by the large exhaust volume Vent-A-Hood should have been assessed and dealt with appropriately by CCA as the HVAC subcontractor.

Air Conditioning Contractors of America ["ACCA"] outlines the standard procedures that have generally been adopted for design, installation, maintenance, repair, and testing for residential HVAC systems. The HVAC contractor is responsible for measuring airflow and static pressures with all air exhaust equipment operating. The HVAC contractor should then provide evidence of documented field measurements and calculations recorded on a new system start-up sheet to show that the calculations have been made and the home is properly balanced.

It is apparent that CCA did not measure, or did not properly measure, airflow and static pressures, nor record them. Had CCA done such calculations properly, CCA would have determined that the home was under negative air pressure when the vent hood system was operating. According to ACCA, where negative air pressure in the home is observed, adjustments are necessary, then the required testing is to be re-performed and recorded on updated documents until balance is achieved and negative pressure is eliminated.

Apparently CCA determined there was some balance issue as it installed a Honeywell fresh air damper system in the attic to provide makeup air. The Allure contract did not specifically call for a damper and CCA did not install dampers in the other two HVAC units located in the basement nor in the kitchen vent hood. Further, adding this Honeywell damper to the Trane HVAC system in the attic was not only not called for in the plans, but was not in accordance with Trane specifications and did not compensate for the make-up air required for the vent hood in the kitchen located on the first floor.

CCA made at least two additional errors in installing this damper. First the damper it installed could not provide a sufficient volume of air to make up for the air being exhausted by the three HVAC heating/cooling systems and the kitchen exhaust system. This resulted in moist, unconditioned outside air being sucked into the home from any opening to the outside when the vent hood system was operating. Second, the amount of outside air the damper did provide to the attic unit overwhelmed the capacity of the attic

4

unit to cool and dehumidify it. This resulted in mold growth in the mixing box and distribution center of the attic unit. To condition this volume of outside air would have required supplemental conditioning greater than the capacity of the attic unit.

CCA should have provided sufficient make-up air directly to the vent hood which would have then exhausted the unconditioned air without circulating it through the home and without creating negative pressure.

To summarize, CCA was negligent in its design and construction of the HVAC systems of the Hall family's home in at least the following ways:

- CCA failed to correctly include sufficient make-up air for the proper and safe operation of three heating/cooling systems and the large volume kitchen vent hood exhaust in the home.
- CCA failed to properly measure and test to determine the pressure in the home with all the systems operating and to properly balance the home to eliminate negative pressure.
- CCA failed to install the proper makeup air system to compensate for the operation of the kitchen vent hood.

## Claim Against Allure

Although CCA as the HVAC subcontractor for the home was responsible for the design and installation of the HVAC systems and vent hood, Allure as general contractor was responsible for the means and methods of construction of all of its subcontractors. The contract with Marcus and Alisa required Allure to construct the Hall family's home: (1) in accordance with the plans and specifications; (2) in accordance with all applicable regulations, codes and ordinances; and (3) in a good and workmanlike manner.

Allure as the general contractor is contractually responsible to Marcus and Alisa for all its subcontractors. That includes responsibility for the interpretation and understanding of the HVAC design and installation to ensure that the Hall family's home was being built by CCA in compliance with the plans and specifications applicable to the HVAC systems and kitchen ventilation system; in compliance with all applicable codes and regulations; and in a good and workmanlike manner.

Allure as a licensed North Carolina general contractor is or should have been knowledgeable of the code requirement for makeup air needed for the high volume Vent-A-Hood kitchen exhaust system. Allure should have been aware of the vent hood system ordered and installed by CCA and the resulting obligation to ensure that the code requirement for makeup air was satisfied. Allure should have required that CCA test the HVAC systems and vent hood to determine whether the home was balanced with the vent hood operating at full capacity. Allure should have been aware of the damper system in the attic and its inadequacy to compensate for the high volume vent hood in the kitchen. Had

5

Allure performed its contractual duties, it would have learned that the CCA design did not provide the makeup air required by the 2012 NC Mechanical Code nor had CCA tested to insure balance.

For the reasons stated above, Allure breached its contract with Marcus and Alisa to construct the Hall family's home in compliance with the plans and specifications; in compliance with all applicable laws, regulations, codes and ordinances; and in a good and workmanlike manner.

## Claim Against Newcomb

ACCA has also promulgated standards for the maintenance of residential HVAC air distribution systems (Checklist 5.1d) which includes inspection of accessible ductwork for areas of moisture accumulation or biological growth.

| Checklist 5.1 Air Distribution System | | |
|---|---|---|
| # | Inspection Task | Recommended Corrective Actions |
| a. | Inspect for particulate accumulation on filters. | Clean or replace filters if accumulation results in PD higher than design or if airflow is outside of established operating limits. |
| b. | Inspect air filter housing integrity and air seal. | Correct as needed. |
| c. | Inspect grilles, registers, diffusers, and trunk/branch balancing dampers for dirt accumulation. | Clean as needed. |
| d. | Inspect all accessible ductwork for areas of moisture accumulation or biological growth. | Install access doors as needed. Clean or replace as needed. |
| e. | Inspect integrity of all accessible ductwork insulation. | Repair ductwork insulation and associated exterior vapor retarders and repair all accessible rips, voids to insulation adhesives and/or tapes. |
| f. | Inspect the integrity of all accessible ductwork including: duct strapping, hangers, sections, joints, and seams. | Note improper alterations, straps, air leaks, and failing duct tapes or mastics. Repair, seal, replace as necessary. |

During annual maintenance visits in 2016, 2017, and 2018, Newcomb apparently did not inspect accessible ductwork. Mold growth in the mixing boxes and distribution centers of all three units was obvious in 2018. Laboratory testing proved the mold to be Aspergillus/Penicillium. Proper inspections even in 2015 after a year of operation would have revealed the presence of excessive moisture and mold on the surfaces of the insulated air handler supply boxes, particularly in the attic. Or if Newcomb did properly inspect the accessible ductwork and air handler supply boxes, Newcomb failed to disclose to Marcus and Alisa the presence of excessive moisture and mold growth as it should have done.

Had Newcomb properly performed its maintenance duties and reported the presence of mold to Marcus and Alisa, the problem could have been remedied in late 2016 rather than late 2018, saving substantial medical expenses for Alisa, two years of suffering and anguish, and possibly eliminating the permanency of her injuries. In addition, the nature and extent of the remediation of the home could have been reduced.

## Damages

Paid medical expenses for Alisa include $94,498.50 for medical providers and $14,475.38 for medications and recommended supplements. Marcus will also have a personal injury claim although not nearly as extensive as Alisa's. Related records and bills will be provided upon receipt.

Marcus and Alisa have paid $3,045 per month for the lease at 200 Penley Circle since December 1, 2018. To date, they have paid $57,855. In addition to the lease amount for 200 Penley Circle, Marcus and Alisa have had to pay utilities for the leased residence. Utility bills from December, 2018 to December, 2019 have amounted to $4,068.13. Incidental household purchases documented in a spreadsheet included herein total $12,761.22. This does not fully account for the belongings that the Halls will need to replace, as they have not yet redecorated and replaced much of their furniture due to the Penley Circle residence being furnished. The Halls have estimated the cost of furnishings and personal belongings that were lost. A spreadsheet documenting these estimates is included herein. The approximate value of all belongings was $87,744.

Remediation costs have included the services of Bob Herrick, Enpuricon, Brothers Cleaning, Weathermaster, White Glove, Wind Rose Construction, J Park Builders, Roman Buatista Painting, and North State Wood Products. Bob Herrick has invoiced Marcus and Alisa $74,405.00 for his services. Frank Tyndall has invoiced Marcus and Alisa $17,250.00 for his services. The remaining contractors have invoiced a total of $71,096.30. Copies of all invoices are provided.

Special damages therefore total $442,657.19. This does not take into account the physical pain and mental suffering, both past and future, that is a part of Alisa's personal injury claim.

## Supporting Documents

All supporting documents are available through a Sharefile link. Supporting documents include:

- Contracts
- Newcomb Maintenance Records
- Mold Spore Trap and Bulk Testing Results
- Curriculum Vitae for Experts and Invoice for Bob Herrick
- Remediation Costs
- Incidental Costs
- Medical Records (To Be Updated)
- Medical Bills (To Be Updated)
- Medical and Remediation Chronologies

We believe this to be all the relevant non-privileged documentation possessed by our office. Should you be in need of information not provided herein, please let us know. We will work with you to obtain such information as best we can.

### Conclusion

We look forward to receiving an offer from each of your clients to resolve this matter. To the extent that the parties are unable to informally resolve the claims of Marcus and Alisa, we would recommend pre-suit or early mediation to determine whether a resolution can be reached before all parties incur substantial time and expense in litigation.

Thank you,

E.D. Gaskins, Jr.

Katie King